## CUNARD S. S. CO., Limited, v. KELLEY et al.

(Circuit Court of Appeals, First Circuit. October 15, 1903.)

### No. 482.

1. APPEAL—REVIEW—EVIDENCE TO SUPPORT VERDICT.

It is not permissible for a jury to base an inference of fact upon another fact which is only established by presumption. Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved and not themselves presumed.

2. SAME.

A jury is bound to exercise its judgment in accordance with correct and common modes of reasoning. It cannot adopt an inference from a few of the proven facts, when that inference is absolutely inconsistent with and is repelled by other equally well-proven facts.

3. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* not to sustain a verdict holding a steamship company liable for nondelivery of goods described in the bills of lading, which were issued by an agent without authority when the goods were in warehouse, where the burden rested on the plaintiff to show that such goods were actually received on board the vessel.

Aldrich, District Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Massachusetts.

See 120 Fed. 536.

George Putnam (Putnam & Putnam, on the brief), for plaintiff in error.

Sherman T. Whipple (Whipple, Sears & Ogden, on the brief), for defendants in error.

Before COLT, Circuit Judge, and ALDRICH and BROWN, District Judges.

BROWN, District Judge. The question before us is whether, upon the evidence, the jury reasonably could have found that 53 bales of goatskins, with the plaintiffs' marks and numbers upon them, were received on board the steamer Tarifa, of the Cunard Line, at Naples. The previous decision of this court relating to this case is reported in 115 Fed. 678, 53 C. C. A. 310.

The following facts are undisputed: One hundred and one bales or packages were taken aboard the steamer Tarifa from a lighter at Naples. Fifty-three were consigned to the plaintiffs at Boston, 48 to Salvini at New York. At New York 48 uncovered bales, corresponding exactly in number, marks, and contents to Salvini's invoice and bills of lading, were delivered to Salvini. These bales were marked "R. B.," and were serially numbered. At Boston 53 covered bales were tendered to the plaintiffs. These bales were marked with ink or paint on the covers "A. G. C.," in a triangle, and were serially numbered. They contained sheepskins which had not been bought either by Salvini or Garsin, the plaintiff's agent.

It is also clear beyond a reasonable doubt that these 53 bales of sheepskins had been fraudulently substituted for 53 bales of goatskins which should have been in the lot of 101 bales delivered on board the Tarifa by the lighter. It is also clear that this substitution of goods had been made before the delivery of the 101 bales to the ship.

For the Cunard Company, it was contended that the 53 bales tendered the plaintiffs at Boston were the same bales that came over the ship's side at Naples, and that they bore the same marks as when they came over the side. If this was the fact, the verdict should have been for the defendant, the Cunard Company. By the verdict for the plaintiffs, the jury must have found as a fact that the bales tendered at Boston were not the same 53 bales that were received on the ship at Naples, but that 53 uncovered bales of goatskins, marked with the same marks and numbers as the fraudulent bales, were taken aboard the Tarifa from the lighter. This necessarily involved a finding that the fraudulent substitution of goods was made on the ship after the 101 bales had been placed in the hold. If such a substitution was made, it involved the disposition of 53 bales of genuine goods so that they should not go to the plaintiffs, and the procurement of 53 sham bales to be delivered to the plaintiffs. The entire material for the substitution must be found in the 101 bales which were on the lighter, and were taken aboard the Tarifa at Naples.

The suggestion has been made that there is a possibility that the fraudulent goods were not contained in the lot of 101 bales; but this suggestion is entirely imaginative, and is so opposed to all the evidence that it need not be seriously considered. The authors of the fraud are proven beyond a reasonable doubt to have been the Petriccione, and their transactions with the Punto Franco or warehouse are matters of record.

The entire number of bales deposited by the Petriccione at the Punto Franco was 116. One hundred and one went aboard the ship, and 15 were withdrawn, and not shipped. If, as the defendants in error claim, 53 of the 101 bales that went aboard the ship were uncovered bales of goatskins, it must follow necessarily that the sheepskins went aboard as 48 covered bales marked with Salvini's marks and numbers. It also must follow that in the hold of the ship the marks were taken off from 53 bales of goatskins, that the 53 bales were reduced in number to 48, and that these 48 bales were then marked with Salvini's marks. This, however, would have been but one-half of the process of substitution, for it would have been necessary also to increase 48 bales to 53, to remove the marks, and to substitute and add new marks. To do full justice to the explanation of the defendants in error, we quote from their brief:

"The Cunard Company therefore admits that on thirty-eight bales the marks merely were removed and the Salvini marks substituted in their place. Suppose, therefore, that thirty-eight bales which ultimately went to Garsin were put on board addressed to Salvini, while thirty-eight of the bales, which, when they were received on board, had Salvini's marks on them, ultimately went to Garsin, how could this have been accomplished? The bales which were received by the plaintiffs were marked with ink on the bales. Suppose that those markings had been concealed by markings stitched over Garsin's marks, having Salvini's marks on them. All that it would have been necessary to do would have been to tear off the piece of cloth with Salvini's marks on it, and you have a bale left with Garsin's marks on it. This operation could have been done as the bales were stowed, and it could have been done in a few minutes. As to Garsin's bales, which were marked on the cloth attached to the bales, it would have been very simple to have had lying beneath the cloth with Garsin's marks another cloth with Salvini's marks, and to have removed the upper cloth; or Garsin's marks might have been removed entirely, and new pieces put in their place. This all could have been done in a few minutes.

"Regarding the remaining fifteen bales of Garsin and Salvini's other ten, it might well have been that five extra large bundles might have been put on board, each containing two bundles, and the covers ripped off, leaving ten bundles with Garsin's marks on them beneath, a work of but few minutes, while ten of Garsin's bales might have been tied together in pairs and accepted by Salvini in New York. There would then remain five bundles of Salvini's skins and five bales of Garsin's upon which the marks would have to be changed in the same manner as with the thirty-eight."

Even should we concede to the jury the right to so free a use of the imagination, it is yet requisite that the occurrences imagined should be consistent with facts which are undisputed. The theory of a fraudulent substitution on the ship entirely fails to account for the fact that of the goods bought by Garsin, the plaintiffs' agent, 15 heavy bales had disappeared altogether, and were not found on the ship, or in the lot of 48 bales delivered to Salvini at New York. It also fails to account for the presence in the lot delivered to Salvini of 10

bales more of a certain description of goatskins than had been bought by Garsin.

The theory of a substitution on board the ship breaks down entirely when an attempt is made to reconcile it with the proven facts in the case. The absence of 15 of the plaintiffs' bales shows conclusively that the original lot of 53 bales of goatskins belonging to the plaintiffs was broken up before the delivery of the 101 bales to the lighter, and shows that the authors of the scheme of fraud did not plan to put the plaintiffs' goods aboard the ship in their original condition. The scheme was to defraud the plaintiffs. As it was intended that Salvini should have delivered to him the goods he had bought, the perpetrators of the fraud could have had no reason to ship Salvini's goods under the plaintiffs' marks, except in furtherance of the scheme to cheat the plaintiffs out of their goods by substituting sheepskins.

It is an unquestionable fact that this substitution of the goods was made before the 101 bales were placed on the lighter. What reasonable motive could have existed for marking bales destined for Salvini with the plaintiffs' marks, and the bales destined for the plaintiffs with Salvini's marks, if it were intended, after the goods were put in the hold of the ship, immediately to shift these marks? The authors of the fraud had already encountered such risk of discovery as might arise from the substitution of goods, since in the lot of 101 bales, all of which should have been goatskins, there was unquestionably a large number of covered bales of sheepskins. Considerable argument has been devoted to the difference in appearance between the uncovered bales of goatskins and the covered bales of sheepskins, but this affords no reasonable explanation why the fraudulent bales destined to be sent ultimately to the plaintiffs should not have been marked when put aboard the ship in the manner that they were marked at the time of the tender of the goods at Boston.

Two views were presented for the judgment of reasonable men: First. That 53 covered bales taken from the hold of the ship at Boston, marked with ink on the wrappers, serially numbered, and corresponding in marks and numbers to the bills of lading and invoices, were in the same condition as when put aboard the Tarifa. The Cunard Company's case rests principally upon the bales themselves; the evidence that they were taken from lighters, that they were swung from the lighters into the hold, and upon the gross improbability that the various acts necessary to the substitution were performed in the hold of the ship, as well as upon the absence of any reasonable motive for making such a substitution on the ship. Second. The plaintiffs' contention that on the ship these bales had been fraudulently substituted for 53 uncovered bales of goatskins. To this view was opposed the evidence that the authors of the fraudulent trick were the Petriccione, to whom was intrusted the duty of putting the goods aboard the ship, and who had full opportunity to make a substitution of goods and marks at Naples; the extreme improbability that a rational mind would have devised a scheme of substitution so difficult of accomplishment in the hold of a ship, so liable to defeat,

and so motiveless; and the further improbability that such a scheme, if devised, could have been accomplished in the hold of the ship.

The intention of the Petriccione to send the 53 bales of sheepskins for 53 bales of goatskins is apparent from the fact that 53 bales of sheepskins were carried to the Punto Franco. · There was no scrap of testimony to support the plaintiffs' theory of a substitution of goods on the ship, unless it be found in evidence that the genuine goods, properly marked, were actually put aboard the ship. While it is possible that direct evidence of an eyewitness, who testified that he saw the genuine goods go aboard the ship, properly marked, might be accepted, even in the face of grave doubts as to the possibility of a substitution, yet no jury, in the absence of such testimony, would be entitled to draw inferences from ambiguous or doubtful circumstances, when such inferences are opposed by many undisputed facts and by all the probabilities in the case.

The judgment of a jury must be based upon the evidence in the case. While they may draw legitimate inferences, they may not wander into the field of imagination of remote possibilities. We recognize fully the rule that, wherever the evidence is such that reasonable men may fairly differ as to deductions to be drawn from the evidence, the determination of facts rests with the jury; and we address ourselves directly to the question whether, upon the evidence in this case, reasonable men may fairly differ as to the deductions to be drawn.

The plaintiffs, in proving delivery of the goods to the ship, could not rely upon the bills of lading as evidence of delivery. The jury was instructed that the Cunard Steamship Company did not take possession of the goods at the Punto Franco or warehouse where the goods were deposited when the bills of lading were given. It followed that the bills of lading were issued before actual delivery to the carrier, and that the plaintiffs must prove delivery by other evidence.

By stipulation of counsel it was agreed "that the testimony of witnesses used in the proceedings in the Italian courts against Giovanni and Giosue Petriccione, at the instance of A. Garsin & Co., whether in the form of affidavits or of oral testimony reported in the official report of the hearing before the civil and penal tribunal of Naples, together with the printed copies of exhibits used in said proceedings, annexed to the argument of F. Manfredi and A. De Rensis on behalf of said Garsin in the Court of Appeals at Naples, may be used with the same effect, and subject to the same objections as to competency and relevancy, as if given in the depositions taken upon a dedimus potestatem issued out of this court, but no objections to form shall be open."

In pursuance of this stipulation, plaintiffs read from the Italian record certain testimony of one Rondino and of Francesco Paolillo. This testimony comes before us in substantially the same form in which it came before the jury, and must be estimated according to the import of the language used, and is not affected by such circumstances as the appearance of the witnesses on the stand, their manner of testifying, and so forth. The exact issues in the Italian proceed-

ings are not defined, and it does not appear that the testimony of these witnesses was directed specifically to the same issues which were before the jury. It appears, however, from certain portions of the Italian record, that a question involved in those proceedings related to another fraudulent substitution of goods which were to be sent by the steamship Scindia, when the substitution was not made in the Punto Franco, but by an exchange of lighters, a lighter loaded with sham goods outside the Punto Franco being substituted for a lighter laden with genuine goods.

The plaintiffs rely principally upon the following extract from the testimony of Rondino, who saw Garsin's goods at the Punto Franco, and made two bills of lading for 38 and 15 bales respectively:

"All this is perfectly true, and I could verify that on the day when the one hundred and one bales were shipped—fifty-three belonging to Mr. Garsin, forty-eight to Signor Salvini—I was present at the shipment, and made sure that these were really the goods deposited in the Punto Franco. I remember that one lot of this cargo was directed to New York, another to Boston; but I cannot tell if they were both 'ammogliate' [covered], or only one of those lots."

On being asked to try and remember this circumstance, he replied, "remembering better," that one of these lots was "ammogliate."

This testimony, read as it stands, is of no value upon the question whether the covered bales or the uncovered bales were marked with the plaintiffs' marks. The witness' attention was not directed to the vital question in this case. The burden was upon the plaintiffs to prove their case, and the jury was not entitled to assume that this evidence related to the particular marking of the lot of 53 bales, or to the question whether the 53 bales were covered or uncovered.

The jury were instructed that the Cunard Steamship Company did not take possession of these goods on the Punto Franco; that it was not responsible for these goods while on the wharf, and was not responsible for them until they came over the side of the ship. There was no evidence in the case which showed that Rondino, when watching over or while present at the shipment of goods which were not then in the custody of the Cunard Company, was engaged in the performance of any duty. The suggestion in the brief of the defendant in error that Rondino was "under at least a moral duty" is insufficient. To infer, therefore, that Rondino must have been vigilant with reference to this shipment of goods, which were not then in possession of the Cunard Company, and then to interpret his testimony that he "made sure that the goods which went aboard the ship were really the goods deposited in the Punto Franco," to include "the fact that they went aboard the ship properly marked, and that they were goatskins or kidskins, because otherwise—presumably as his duty required—he would have observed the difference in the packing and covering and the falsification of the marks, and would at once have informed the master of the ship in reference thereto," is to base a presumption that Rondino must have seen the marks upon another presumption that his duty required him to do so.

In United States v. Ross, 92 U. S. 281, 283, 23 L. Ed. 707, it was said of a similar mode of reasoning:

"They are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible. No inference of fact or of law is reliable drawn from premises which are uncertain. Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed. * * * The law requires an open, visible connection between the principal and evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences. Best on Evidence, 95. A presumption which the jury is to make is not a circumstance in proof; and it is not, therefore, a legitimate foundation for a presumption."

See, also, U. S. v. Pugh, 99 U. S. 265, 25 L. Ed. 322.

In Manning v. Insurance Co., 100 U. S. 693, 697, 25 L. Ed. 761, it was said:

"We do not question that a jury may be allowed to presume the existence of a fact in some cases from the existence of other facts which have been proved. But the presumed fact must have an immediate connection with or relation to the established fact from which it is inferred. If it has not, it is regarded as too remote. The only presumptions of fact which the law recognizes are immediate inferences from facts proved."

See, also, Xenia Bank v. Stewart, 114 U. S. 224, 231, 5 Sup. Ct. 845, 29 L. Ed. 101.

Furthermore, if Rondino's testimony be interpreted to mean that 101 bales of goatskins went aboard the ship, he was undoubtedly mistaken in one of the lots for which he gave bills of lading; and his testimony is inconsistent with the theory that the bales of sheepskins could not pass as goatskins.

The plaintiffs also offered extracts from the testimony of Francisco Paolillo (given in proceedings against the Petriccione), who testified to the effect ·that of the lot of 101 bales 48 were covered. Luigi Paolillo, another witness at the same hearing, testified that 53 bales were covered. There are no circumstances from which the jury could have adopted the extract from Francisco's testimony rather than the extract from Luigi's testimony to prove the number of covered bales which went aboard the ship. It does not appear that the question whether the 53 bales or the 48 bales were covered was a material fact to which the testimony of these witnesses was directed. On the other hand, it does appear that a material fact was that 101 bales, a portion of which were covered and a portion of which were uncovered, were taken from the Punto Franco and put aboard the Tarifa. It thus appeared that the present scheme of fraud was not accomplished in the same manner as a previous substitution of goods, which was effected by the substitution of a lighter loaded outside the Punto Franco with fraudulent goods for a lighter which left the Punto Franco with genuine goods.

The plaintiffs base an elaborate argument upon the ship's books, but these entries were entirely indefinite and ambiguous upon the question of which lot was made up of uncovered bales and which of covered bales. We regard the plaintiffs' argument based upon a distinction between the words "bundles" and "bales" as entirely fallacious. The tally book A and the mate's receipt book both contain a record of the receipt of 53 bales of goatskins, but these entries were taken from the shipping orders, and represent and purport to repre-

sent only what the shipper declared the goods to be. The fact that the goods were described by the fraudulent shipper as goatskins, and were so recorded by the ship's officers, proves simply that the goods received purported to be goatskins.

The plaintiffs argue that this entry must be a true description of the contents of the bales, because Naples goatskins are ordinarily packed in uncovered bundles. We are not impressed with the force or logic of an argument that, because Naples goatskins are ordinarily packed in open bundles, the ship's officers would not have received as goatskins covered bundles described by the shipper as goatskins and put aboard by the shipper's agent as goatskins. There was proof that goatskins other than Naples goatskins were frequently packed in covered bales. If we concede that this was a legitimate argument to address to the jury, we must still consider whether such an argument was sufficient to warrant a jury, as reasonable men, in adopting the plaintiffs' inference, when the adoption of that inference involved the adoption of the highly improbable theory of a substitution of goods on the ship, and when the adoption of the simpler inference that the goods were received and entered for what they purported to be would have avoided entirely the improbabilities of the theory of a substitution on the ship. There was certainly no reason for the ship's officers to believe that goatskins could not be contained in covered bales. But the plaintiffs' argument is further unsound because it is not based upon the whole entry, but only upon a part of it. It ignores that part of the entry which describes the size of the packages.

While these entries on the ship's books have no tendency to show that the 48 bales were covered bales, they do prove the dimensions of the 48 bales and of the 53 bales, and establish the fact that the 48 bales were the larger bundles or bales, corresponding to the size of the bales of goatskins delivered at New York. There is no doubt that the bales delivered at New York were larger than the bales tendered at Boston. It is therefore proved that the bales marked with Salvini's marks were the larger bales, both at the time of their receipt over the rail of the ship and upon their delivery at New York, and this fact disposes completely of the theory of a substitution on the ship. The plaintiffs offer no explanation whatever of this portion of the entries upon the ship's books, which is entirely inconsistent with the plaintiff's case, and definitely supports the defense.

We have no occasion to consider the cases cited upon the plaintiffs' brief. They are absolutely dissimilar in circumstances, and have no relevancy to the question of the reasonableness of the jury's finding upon the present evidence. The whole case of the plaintiffs, upon whom the burden of proof rested to show that the goods were put aboard the ship, is based upon conjecture and strained inference. A jury is bound to exercise its judgment in accordance with correct and common modes of reasoning. It cannot adopt an inference from a few of the proven facts, when that inference is absolutely inconsistent with, and is repelled by, other equally well proven facts.

The present record clearly discloses that the jury's verdict was

based upon remote inferences of the most highly conjectural character.

The plaintiff in error is entitled to require that the verdict of the jury shall be "defensible in point of sense." See Thayer's Preliminary Treatise on Evidence at the Common Law, pp. 208–210. In our opinion, the careful brief of counsel for the plaintiff in error has demonstrated beyond a doubt the unreasonableness of the jury's finding.

We are of opinion that the court erred in denying the fifth and twelfth requests for rulings, which were as follows:

"(5) There is no evidence from which the jury would be justified in finding that the goods described in the plaintiff's bills of lading were delivered to the defendants on the steamship Tarifa as and for the goods of plaintiff or of Garsin."

"(12) There is no evidence from which the jury would be warranted in finding that the fifty-three bales of goatskins bearing Garsin's marks and numbers, deposited by Petriccione on the Punto Franco, in the name of his agent, Ricciardi, and which, by agreement with Garsin, Petriccione was to deliver on board defendant's steamer at his own expense, ever came into the possession and control of defendants for carriage as and for the bales of Garsin so as to make defendant liable for their loss."

The judgment of the Circuit Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion, and the plaintiff in error recovers its costs of appeal.

ALDRICH, District Judge (dissenting). At the arguments I had a strong impression that the question as to where substitution of the sheepskins for the goatskins took place was, under the peculiar circumstances disclosed by the evidence, a question of fact for the jury, and that such question was properly submitted.

I still hold to that view. It will probably not be useful for me to elaborate my view in this respect, and I am content, without undertaking to state all the evidence, to leave the case upon the reasoning of the court below, with the single suggestion that, in my opinion, the testimony of Rondino, who saw the bales of goods at the Punto Franco, and who saw them as they were passed to the Tarifa, and made sure that they were the goods deposited in the Punto Franco; the testimony of Edward Hunt, who was an officer of the Tarifa, who says he took particulars of the goods from the shipping orders, and that he tallied the goods from such particulars during the loading; and the testimony of Robert Corlett, who was also an officer of the Tarifa, and who described the process of tallying as the goods passed from the Punto Franco to the vessel—was evidence from which the jury might properly find that the substitution did not take place before the goods were passed from the Punto Franco to the Tarifa. It must be borne in mind that a bale of sheepskins in size and general appearance was quite different from that of a bale of goatskins as they were prepared for shipment at Naples, and that these men, who were experienced, and had knowledge about such matters, were describing the process of passing the bales under their eye and under shipping orders and tallying precautions, which in-

volved an observation of the labels and tags as well as the bales themselves—a process which covered the period between the reception at the Punto Franco and the time when they were received on board the Tarifa.

In my opinion, the question submitted was peculiarly a question of fact for the jury, and one which cannot be decided one way or the other as a question of law.