## THE EDWARD A. UHRIG.

## THE DELAWARE.

(District Court, W. D. New York. August 14, 1925.)

### No. 1362.

**1. Collision ⊂⇒73 — Navigating tugboat and steamer held presumptively at fault for collision with sandsucker.**

Navigating tugboat and steamer *held* presumptively at fault for collision with sandsucker, which was in position like that of vessel at anchor.

**2. Collision ⊂⇒73—Steamer held to have burden of showing that assisting tug was liable in whole or part for damage to sandsucker.**

Steamer proceeding under her own power, though assisted by tug, which was guiding her into draw, *held* to have burden of proving by preponderating evidence that tug was solely or partly responsible for damages to sandsucker, against which stern of steamer drifted.

**3. Collision ⊂⇒74—Evidence held insufficient to show that tug, assisting steamer, was responsible for damage to sandsucker.**

Evidence *held* insufficient to show that tug, assisting in guiding bow of steamer into draw, was liable either in whole or part for damages to sandsucker from drifting against it of steamer's stern.

**4. Collision ⊂⇒142—Vessel at fault for collision is not liable for increasing damages by reason of subsequent negligence of vessel injured.**

Vessel at fault for collision is not liable for increasing damages by reason of subsequent negligence of vessel injured.

**5. Collision ⊂⇒142—Steamer not liable for sinking of sandsucker, due to her own negligence after injury.**

Steamer, damaging sandsucker by drifting and pressing against it as she slipped through draw, *held* not liable for damages for subsequent sinking of sandsucker, due to continued loading, without proper inspection to ascertain extent of her injury.

In Admiralty. Libel by the Squaw Island Sand & Gravel Corporation against the steamer Edward A. Uhrig, her engines, boats,

etc., and the steam tug Delaware, her engines, boilers, etc. Decree against the steamer Edward A. Uhrig entered, and libel against the steam tug Delaware dismissed.

Stanley & Gidley, of Buffalo, N. Y., for libelant.

Thomas C. Burke, of Buffalo, N. Y., and Goulder, White & Garry, of Cleveland, Ohio, for the Uhrig.

Brown, Ely & Richards, of Buffalo, N. Y., for Great Lakes Towing Co.

HAZEL, District Judge. On the night of October 5, 1924, the steam sandsucker Excavator, which was moored to her dock on the northerly side of Buffalo river, about 280 feet from the Ohio street bridge, where the channel is approximately 280 feet wide, received damage by impact and pressure from the steamer Edward A. Uhrig. As her name implies, the Excavator was used for pumping gravel out of river beds. The Uhrig is a steel freighter, 550 feet in length over all, 56 feet beam, with a molded depth of 31 feet. While proceeding slowly and warily towards the draw of the bridge and abreast of the Excavator, she was caused, by reason of faulty navigation, to swing over against her. She was assisted in her movements by the tug Delaware, and with her starboard side, at No. 27 hatch, touched or pressed the Excavator at her starboard corner while slowly moving in the north draw of the bridge. She had just completed unloading ore at the Hanna furnace dock about 1,500 feet away, and was going light; her forward part high out of the water, and her draught showing 15 feet 6 inches aft and 5 feet forward. A fresh wind was blowing from the south, say 15 to 18 miles an hour, which, because of the location of an elevator on the south side of the river, caused wind currents to strike her port side while passing the Excavator. The Delaware is one of the most powerful tugs in the harbor. She had a suitable line of proper length fast to the steamer; the line extending 20 feet from the stern of the tug to the steamer's stem. The libelant demands damages amounting to $21,931.39, but an earnest contest has arisen as to whether the collision was the proximate cause of the major part of her injuries, since she sustained additional damage afterwards by sinking in Niagara river while engaged in pumping gravel and sand.

[1] The responsibility for the impingement must first be established, and much testimony has been given in relation thereto, since there are conflicting claims between the Uhrig and

Delaware as to the liability; the steamer contending that the tugboat was solely at fault in permitting her to drift northward against the sandsucker, while in opposition the tug urges that the steamer improperly directed her to stop working her engines ahead, a direction obeyed by her, and that the steamer failed to port her helm as she should have done to avoid sagging into the sandsucker. Although the latter was in her berth in a somewhat exposed condition, considering the shape of her stern, the width of the river, the nearby bridge abutments, and the combined width of the two vessels when abreast of each other, together with their lengths, still she was not unlike a vessel at anchor. The navigating tugboat and steamer were presumptively at fault, since the duty rested upon them of keeping clear of her. Even if the impact were to be considered an unavoidable accident, the steamer and tug nevertheless were required to exonerate themselves from blame by proving they were powerless to prevent the contact by using ordinary precautions. The Gulf of Mexico (C. C. A.) 281 F. 79. Both the tugboat and the steamer, of course, were aware of the presence of the Excavator at her dock, and her propinquity to the drawbridge. Accordingly commensurate care, precaution, foresight, and skill were required to meet the conditions of safely passing her.

The testimony bearing upon the liability of one or both falls within a narrow range. There was no indication of contact until the steamer's bow came into the draw of the bridge. The tugboat had been pulling the steamer to starboard, in order to get her free from the abutment which was in her path; but, having freed her, her bow swung within the draw. The claim is urged by the steamer that the tugboat should at once, upon reaching this position, have shifted to port to pull on the steamer's bow, to straighten her up and give sufficient clearance for safely passing. The evidence, however, precludes this determination.

The version of the tugboat Delaware is that the Uhrig was being pulled northward, as was necessary to avoid hitting the center abutment, and that while so heading her master received a check signal, which he at once obeyed, and without further action on his part the steamer sagged down at her stern and against the sandsucker. It is conceded that the master of the Delaware, after checking the headway of the tug, hailed Capt. Stewart of the Uhrig, who was on the pilothouse, to go ahead on a port wheel, and it is testified that he assented. But the as-

sent is denied by Capt. Stewart and several witnesses aboard the steamer, who say that the reply was to the effect that he could not do so. It was also testified on the part of the steamer that she had been pulled over northward to about 8 feet off the northerly abutment, and her bow was about 100 feet through the draw; but I think the facts and circumstances show that she was farther away and not as far through the draw. The first and second mates of the Uhrig, on watch, observed the sag at the steamer's stern, but no report thereof was made to the master. This failure, to my mind, was plain negligence on their part.

It is not improbable that the hail of the tug was misunderstood. However that may be, fault, in my view of the evidence, is not attributable to the tugboat in pulling too hard at the steamer's bow and too close to the northerly abutment. Capt. Farrell's testimony as to the distance from the abutment is corroborated by others of his crew, and I think the chart in evidence bears him out, that, when proceeding 50 or 60 feet from the draw, the bow of the steamer was headed above the south abutment, and that it was necessary to pull a little strong towards the northerly abutment in order to enter the draw; that, while the bow was still above the center abutment, he received the checking signal to which reference has been made. He was then asked what happened, and replied: "Why, he (Uhrig) started to come down slow, and I steadied my tug up just as soon as I seen he was going to clear the corner of the abutment; that was all I had to do—to see that he cleared the center abutment going through the draw of the bridge, and I went ahead" of the steamer; that he then noticed the steamer starting to sag down, but there was nothing for him to do after she had got into the draw. Capt. Stewart was in a position where he could observe the drifting of the steamer, but it was dark, and he should have been informed by his mates of the sagging at her stern, so that he could have then taken measures to prevent the impact. It is difficult to perceive why he did not anticipate her veering over, since the wind on her port side had a tendency to swing her over, and measures to control her stern sagging should have been taken, without waiting for the tug to take the initiative.

Assuming that the freighter was as near the north abutment as he was informed by the first mate, she should have directed the tug to pull to port, which she quickly could have done by turning over to port from the star-

board side of the freighter's bow. Had this been done, the steamer, no doubt, would have straightened up at her bow, and, swinging under a port wheel, the mistake would have been avoided. That a tug ordinarily guides a steamer in the towing operation, in view of the circumstances presented, was not an explanation of the failure to take means for breaking the sag to northward. Indeed, as I understand the expert witnesses, Walle and Gardner, they, under similar circumstances, would have directed the tug to hold up the steamer's bow and pull to port, and, if she was not in a proper position so to do, they would have directed her to get into position to execute the movement, so as to enable the steamer, using her port wheel, to prevent striking an object on her starboard.

It is true, as argued, that ordinarily a tugboat, in charge of a steamer, dominates the movements, especially in restricted or congested places; but the specific duty of the tug in the case at bar was to guide the bow of the steamer into the draw, without responsibility of stern movements by a steamer operating under her own power. In my view of the evidence, the tug is not shown to have been at fault. She fulfilled her duty in maneuvering the bow of the steamer safely into the draw, and, without instructions from the steamer to do more in that relation, she was not called to act. The collision could have been avoided by a skillful use of the helm—a use to which her master did not resort, because of his failure to realize or appreciate the hazardous sagging of the stern towards the northerly side.

[2, 3] The situation was not in extremis, or one justifying exoneration from negligent navigation. The burden of proving by preponderating evidence that the tug was solely or partly to blame rested on the steamer, and this burden she has not sustained. The collision is attributable to her sole fault—the fault of failing to port her helm, so as to prevent her stern from sagging into the sandsucker. Had she promptly ported (she could have done so without injury to herself), the accident would not have resulted. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943.

As to the damages: There is no doubt that the injury to the stern post of the Excavator caused her to sink on Monday, while engaged in pumping gravel and sand from the Niagara river into her compartments. But the contention on this point is that libelant can recover only for damage which directly resulted from the collision, and her

sinking and raising and delay (the larger part of her damages) were sustained in consequence of libelant's own negligence in not having adequate inspection made before resuming operations by the sandsucker, to discover the character and extent of her injuries from the collision.

In opposition to this contention it is argued that an examination and inspection of the sandsucker's interior was made upon the morning following the collision, and that the hurt to her stern post was not visible by the exercise of reasonable care. The proofs are that she was built entirely of wood, and had two steel trusses running fore and aft for strengthening, with iron covers at the corners extending downward to the light water line. Her full capacity was about 525 yards of sand and gravel, and at the time of the collision she had aboard about 350 yards. Her night watchman was in charge of her. While cleaning the flues of the boiler, he was startled, he testified, by the severity of the impact, and, conceiving what had happened, he hurriedly went on deck and saw the Uhrig rubbing along the starboard side. He immediately operated siphons to discover a leak, but there was very little water in her hold. Early next morning (Sunday) he observed the contact marks on the starboard side toward the upper corner, and reported the occurrence to the pumpman, who had come aboard, and who also tried the siphon, but no unusual amount of water was fetched up.

The ship's carpenter and his helper came aboard in the forenoon to repair planking in the top deck, and, upon learning of the accident, they examined the hold up and down the sides as they proceeded through, each having a lantern, to ascertain the extent of the injury. No break of planking or spewing of oakum was found. Both sides of the stern seemed to them to be intact. There was no break observed under the water line. The stern post was not visible, it being covered by the cheek pieces, and any impairment to it could only have been ascertained, it was testified, by ripping open some of the stern frames. No external examination or inspection was made. After unloading the boat on Monday morning, she proceeded to Niagara river and resumed her pumping. Before doing so, however, libelant's superintendent was informed of the occurrence, and told that some timbers had cracked in her, but they could not see them, and that no leak had developed. After the sinking, and when the sandsucker was in dry dock, it was found, upon remov-

ing the stern planking on the outside, that the stern post had pulled away from the bulkhead and several stern planks were sprung out. The ship's carpenter, Wilson, admitted that, if an outside examination in a small boat had been made, the condition of the stern could, no doubt, have been discovered.

The master of the tug Conneaut testified that he examined the stern in Niagara river from the deck of the tug after loading started. He looked, he says, on the starboard side and at her port quarter, but saw no break in the planking. It was at most a superficial examination. No plausible reason is shown as to why the stern on the outside was not examined on Sunday, or before starting down the river on Monday. Had there been, no doubt the injury to her planking would have been observed. The witness Smith, an expert marine surveyor, testifying for respondent, swore that, if an external examination of the Excavator's stern had been made, her condition could readily have been ascertained, and, in his opinion, there was no need of tearing away any cheek pieces, interior frames, or planking to determine her condition.

Proctor for libelant suggests that, since displacement of the stern post was due to pressure, the planks on release of the pressure resumed their normal position, and hence the break was invisible. This suggestion however is unsubstantiated by the proofs, nor am I impressed by the sagging theory of the sandsucker, during her loading, resulting also, as Proctor asserts, in concealment of the fractured planking on the outside. Such theory should have been supported by convincing evidence. The Rosalia (C. C. A.) 264 F. 285; Cunard S. S. Co. v. Kelley, 126 F. 610, 61 C. C. A. 532. The evidence in its entirety shows that the injury would have been found, if proper care had been exercised and a survey of her condition made before the Excavator resumed her operations. Her condition, as disclosed by the survey, was not incompetent or immaterial. The Mason, 249 F. 718, 161 C. C. A. 628.

[4] The severe pressure or impingement by the freighter on the Excavator, a wooden vessel, with a two-thirds load of sand aboard, would ordinarily be regarded a warning and adequate grounds for subjecting her to a more careful examination than was given her before she began her operations. It was required that reasonable steps to prevent further damage should be taken, since the rule is that a vessel at fault for a collision can-

not be held liable for increasing damages by the subsequent negligence of the vessel injured. The Baltimore, 8 Wall. 377, 19 L. Ed. 463. This principle also finds support by analogy in Eclipse Lighterage Co. v. Cornell Steamboat Co., 242 F. 927, 155 C. C. A. 515. See, also, decision of Judge Hand in The Barge Mars (D. C.) 9 F.(2d) 183, 1925 A. M. C. 483.

[5] My conclusion is that the collision in question was not the proximate cause of the sinking of the vessel injured and the ensuing damage, since respondent could not anticipate that she would be used in her pumping operations without proper inspection and repairs. The damages must therefore be limited by the commissioner to those immediately resulting from the mishap.

A decree, with costs against the steamer Edward A. Uhrig, may be entered in conformation with these views, and the libel against the steam tug Delaware is dismissed.

So ordered.