**THE BUTTERCUP. THE INDEPENDENT. NATIONAL OIL TRANSPORT CO. v. UNITED STATES.**

(District Court. E. D. Louisiana. October 28, 1925.)

No. 16517.

Towage ⟋15(2)—Evidence held to sustain finding that stranding of oil barge in river was not due to negligence of pilot or tug.

Evidence *held* to establish that stranding of oil barge in river was due to hidden obstruction, namely, uncharted mud lump, and not to negligence of pilot or tug.

In Admiralty. Libel by the National Oil Transport Company, owner of the oil barge W. A. Ebsen, against the United States, owner of the tugs Buttercup and Independent. Decree for defendants, dismissing bill.

Eugie V. Parham, of New Orleans, La., for libelant.

Edouard F. Henriques, of New Orleans, La., for the United States.

Philip S. Gidiere, of Spencer, and Gidiere, Phelps & Dunbar, of New Orleans, La., for respondent Bisso Towboat Co.

BURNS, District Judge. Libelant claims damages resulting from alleged negligent towage of its oil barge W. A. Ebsen, which was grounded in the Mississippi river some

39 miles below New Orleans. The amount sued for is the alleged cost of floating the barge and repairing certain damages resulting from the grounding. The libel is in rem against the harbor tug Independent, and in personam against the United States upon in rem principles as owner of the seagoing tug Buttercup.

The Buttercup was under charter or towage contract dated January 24, 1920, between W. G. Coyle & Co., managing operators for the United States, and the National Oil Transport Company (now a bankrupt represented by its trustee), for a voyage from Coyle's yard, New Orleans, to Orange, Tex., there to pick up the wooden oil barge W. A. Ebsen empty; thence to Tampico, Mexico, for a cargo of oil to be delivered to Southport or Plaquemine, La., on a basis of $850 per each day of 24 hours until the tug's return to Coyle's yard.

This voyage had been almost completed. The barge, having left Tampico towed by the Buttercup, arrived off the mouth of the river, where an additional tug was necessary to negotiate the high stage of the river and consequent swift current. On the voyage up the river the tug Independent was lashed to the starboard stern quarter, whilst the Buttercup continued lashed on the port stern quarter. Under the compulsory pilotage laws of the state of Louisiana, a bar pilot had brought the barge, under tow as above stated, into the head of the Passes, and there two river pilots came aboard to work in relief shifts day and night, navigating the river thence to New Orleans.

The evidence fails to show any negligence on the part of the Independent, and it was conceded in argument and brief that the Independent was without fault. The evidence shows that, when the barge reached the point at which it grounded, vaguely described as some 39 miles below New Orleans, and proceeding along a course paralleling the east bank, at a distance variously described as from 200 to 400 feet from shore, at or near a place called Harlem, where the river is one-half to three-quarters of a mile wide, it suddenly touched bottom, or a mud lump on the bottom, so that the stern raised several feet out of the water; that simultaneously the river pilot gave the order to starboard the helm, intending this order for the pilot of the Buttercup. Up to this point there is no conflict in the evidence, but upon this point there is a sharp conflict, which will be discussed further on. It is shown without contradiction that the barge, upon first touching the mud lump, sheered, and, as her

bottom abaft of amidships stuck fast, the bow swung to starboard until she lay crosswise in the stream, and finally settled on the bottom with her bow toward the bank at an angle of about 45 degrees.

The conflict in testimony is between that of the master and some of the crew of the Ebsen, on one hand, and that of the river pilot and the master and some of the crew of the Buttercup. The testimony of the Ebsen crew was taken on behalf of libelant between July and September, 1921; that on behalf of the United States between July and December, 1923. Capt. Smith, the master of the Ebsen, testified in effect that, at the time the barge touched bottom and commenced to sheer, the river pilot, Capt. H. G. Voghts, shouted his order, "Hard astarboard!" to the captain of the Buttercup, but that nobody was in the pilot house of the Buttercup at that time; that the first time he saw the captain of the Buttercup was when the latter ran up the steps of the pilot house and commenced to put the wheel over, but by that time the barge had got across the current and turned almost crossways of the river, and the force of the current forced the barge down the river toward the bank, when she settled in the mud lump 'perfectly stationary. He also testified that the pilot had complained several times before that no one was on duty in the pilot house of the Buttercup. The other witnesses from the Ebsen testified generally that the Buttercup failed to comply promptly with the order of the pilot at the time of the stranding. If the testimony of these witnesses, particularly that of the barge captain, could be taken as true, it would show an almost criminal negligence in navigation, and because of this I have carefully analyzed all of the testimony of all the witnesses.

The river pilot, Capt. H. G. Voghts, testifies in a most convincing manner, and specifically denies the testimony of the barge captain, labeling it as untrue. He testifies that his orders to the Buttercup were immediately obeyed; that the vessel was then from 300 to 350 feet from the east bank; that there was nothing in the river to indicate the presence of the mud lump; that the Buttercup was fully manned; that he had made no complaint against the Buttercup, its officers, or crew, and that there was no cause for such complaint; that the pilot house, particularly, was manned at all times; and that there was a man at the wheel before and at the time of the stranding, who immediately obeyed his orders. This testimony of the river pilot, considered together with that of

the captain, engineer, and seaman of the Buttercup, convincingly disproves the testimony of libelant's witnesses, and leads to the conclusion, so far as the evidence of record goes, that the stranding was due to a hidden obstruction, consisting of an unknown and unchartered mud lump forming a shallow place on the bottom, such as frequently happens with the shifting of silt formations and sand boils in the Mississippi river.

Citation of authorities by libelant: The Steelore (C. C. A. 4th Cir.) 1925 A. M. C. p. 319, 3 F.(2d) 782, decided January 13, 1925; The Pacific Maru (D. C.) A. M. C. 1925, p. 1446, 8 F.(2d) 166, to the effect that the mere fact that a tow receives, injury does not render the tug liable; that negligence must be affirmatively shown; that the tug is not an insurer of the safety of the tow, nor responsible for errors of judgment on the part of the master if a competent seaman exercising due care; that negligence is not presumed from the mere happening of an accident, and the burden of proof rests upon those seeking to establish the tug's liability therefor; that the duty of the tug is not that of a common carrier, and is restricted to the exercise of that care and diligence which a careful mariner would exercise under like circumstances; and that this diligence and skill are measured with reference to the conditions as they existed at the time of the accident, are all propositions of law accepted as applicable to this case. Other authorities to like effect are The Edward A. Uhrig (D. C.) A. M. C. 1925, p. 1503, 9 F.(2d) 185; The W. H. Baldwin (C. C. A.) 271 F. 411; The Atlantic City (C. C. A.) 241 F. 62; Clarence L. Blakeslee, 243 F. 365, 156 C. C. A. 145.

In the case at bar libelant failed to sustain the burden of proof. The evidence does not support his contention that either the pilot or tugs were at fault. Not only was there no evidence to show that the pilot should have known the existence of the mud lump on the bottom, the draught of the tow being considered, but there was no evidence produced to show the exact locus in quo of the stranding in the river, whether it was at or near a curve or a bend, or that soundings at that point were known, or could have been known by diligent inquiry, or that a safer channel might have been pursued by the pilot. On the contrary, such evidence as there is upon this point is all to the effect that the course steered by the pilot was approximately the usual course steered by vessels bound up stream.

Having reached the conclusion that there

was no negligence on the part of either the pilot or the tugs, and therefore no liability for the damage, it is not necessary to determine what effect, if any, the compulsory pilotage rule might have on the liability of the vessels or owners.

Accordingly, there will be a decree for defendants, dismissing libelant's bill, at its cost.