**STATE, Plaintiff-Appellee, v. NEVIUS, Defendant-Appellant.**

Ohio Appeals, Second District, Clark County.

No. 457.   Decided December 14, 1945.

66

Simon L. Leis, Cincinnati, Homer Corey, Springfield, and Stewart Tatum, Springfield for plaintiff-appellee.

Paul M. Herbert, Columbus, and Aaron Halloran, Springfield for defendant-appellant.

## OPINION

By MATTHEWS, J.

The appellant was indicted and convicted on three counts, charging the acceptance of bribes as prosecuting attorney of Clark County, in violation of §12823, GC of Ohio. Alternate counts in the indictment charged Joseph Parisi and Ralph Schear with having given the bribes. The court granted the appellant's motion for a separate trial. This appeal is from the judgment of conviction rendered at that trial.

(1) The first count (second in the indictment) charged that appellant did on or about the 14th day of August, 1944, at the County of Clark, State of Ohio, unlawfully, fraudulently, and corruptly accept an automobile of the value of Thirteen Hundred ($1300.00) Dollars from Joseph Parisi and Ralph Schear, with intent to influence him with respect to his official duty as Prosecuting Attorney of Clark County, Ohio.

In support of this count, which was equally applicable to all the counts, the State offered evidence that Parisi, Schear, and one Melvin Thomas had been prosecuted by appellant in 1938, on a charge of conducting a gambling establishment, known as Tecumseh Park in Clark County. They were convicted. They then moved to the adjoining county of Miami, where they continued to conduct commercial gambling until 1940, when they moved to a place known as "Silver Dollar", close to the line between Clark and Greene Counties, where they continued to conduct gambling as a business and from which they spread their gambling activities over a wide area embracing several counties.

Competent evidence was offered tending to prove that from 1940 to December, 1944, Parisi, Schear, and Thomas operated Silver Dollar as a gambling place so openly and on such a large scale that it was generally known that gambling was carried on there. There was testimony that appellant visited the Silver Dollar frequently and stayed on these visits from fifteen minutes to half an hour. There was other evidence that appellant had information, which, if pursued, would have disclosed that gambling was going on at the Silver Dollar, and evidence of failure on his part to make any ef-

fort to discover the truth, and, if that disclosed gambling, to proceed in any way against the guilty. The only reason for failure to proceed given at any time was that the Silver Dollar, the focal point from which the gambling proceeded, was located in Greene County. Whether it was so located, we will not discuss here.

So there is abundant evidence that there was gambling in progress in violation of law, and a failure by the appellant to proceed to suppress it. That, however, is not sufficient to justify a conviction for accepting an automobile as a bribe from the gamblers, for inaction in that regard.

Now what is the evidence as to the way in which this automobile came into the ownership of appellant?

The State called Edwin B. Fred, who had been a dealer in Buick and Pontiac automobiles at Lebanon, Ohio, from 1936 to early in 1942, and had sold automobiles in many of the surrounding counties during that time. He testified that in August, 1941, he went to Indianapolis, Ind., and there bought a new Buick automobile from Monarch Motor Car Co. and drove it back to Lebanon. He paid for it, but does not remember whether payment was made to Monarch Motor Car Co. or to The Buick Company. We infer that the two places of business were close together and perhaps the former company was a selling agent or dealer for the latter.

Fred testified that he had no independent memory as to what became of the automobile, but from the record he concluded that he sold it to the appellant. He didn't remember having been paid for it, but when shown appellant's check, dated August 13th, 1941, payable to him, identified his endorsement, and from the bank stamps, etc., testified that it had been deposited in his bank and the proceeds placed to his credit. He remembered nothing about the delivery of this specific automobile. He said he thought he remembered delivering an automobile to a vacant lot in Springfield. His memory was no weaker and no stronger about a transaction in Dayton at Standard Motor Sales Co., when shown a stamp on the check, which seemed to indicate that it had been filled in there. The only irregularity in this sale, as disclosed by the State's evidence, was that the residence of the appellant was given as at Mason, Warren County, Ohio. This was in the handwriting of Fred's bookkeeper, who testified to her handwriting. She also testified that she never saw the appellant until a much later date, when she appeared at the Clark County Court House to testify before the grand jury.

The State offered no evidence of any connection of either Parisi or Schear with this automobile transaction. The near-

est approach to that was the testimony of Fred that he believed he had sold automobiles to Parisi, which, of course, is no evidence of the sale of this automobile to him, or that he had anything to do with its transfer to the appellant. No evidence was offered that either the title or possession of this automobile was transferred to appellant in Clark County, Ohio.

The most, therefore, that can be said of the effect of the State's evidence on this count is that it proves such widespread and open gambling as to indicate that there existed supine indifference on the part of all the law enforcing officials including the prosecuting attorney, but it does not prove or tend to prove that the prosecuting attorney accepted the Buick automobile from Parisi or Schear or anyone else. Now was this fatal deficiency removed by the appellant's own testimony?

Now, on the subject of this Buick automobile, the appellant testified and was corroborated as to many of the details, that in 1941 he owned two automobiles—a Studebaker and a Ford—and wanted to dispose of them and purchase a Buick. After making inquiry in Springfield of dealers and being unable to find a Buick, he learned through his investigator in his office that he could get one in Dayton from a Mr. Slavin, who did business there under the name of Standard Motor Sales Co. Accordingly, he went to Standard Motor Sales Co., delivered his Studebaker and Ford to it for sale and there bought the Buick from Ed. Fred, whom he met there. The source of the money used in the purchase and all the other circumstances were developed in great detail. While the state characterizes the appellant's testimony as incredible, we are unable to so consider it. In any event, it contains nothing that could be used as admissions, express or implied, to connect Parisi or Schear, or either with this transaction in any way or to create an inference that either the title or possession of this Buick automobile was transferred to appellant in Clark County.

The trial court erred in overruling the motions of appellant, made at the close of the State's evidence and renewed at the close of all the evidence for an instructed verdict of not guilty, and is now entitled to a reversal of the conviction on said count and a discharge therefrom.

(2) In the next count upon which appellant was found guilty, the State charged that on or about August 26th, 1943 in Clark County, Ohio, the appellant unlawfully and corruptly accepted an automobile of the value of $1437.00 from Joseph Parisi and Ralph Schear, with intent to influence him in respect to his duties as Prosecuting Attorney of Clark County.

Without detailing the evidence relating directly to the acquisition of this automobile it seems sufficient to state that the appellant admits that he obtained a Buick automobile from Joseph Parisi about the time laid in the count, but testified that he paid full value ($1200.00) for it in cash, and that it was not transferred to him to influence him in the discharge of his official duties. There were circumstances which cast doubt upon appellant's denial. There was, therefore, present in the evidence relating to this automobile what was absent in connection with the other, to-wit: that it was Parisi who arranged for and actually transferred the title and possession to the appellant, and an issue as to whether appellant paid cash for it, or whether it was a bribe, and that title was taken in Clark County, Ohio.

On this count, the record presents the problem of weighing evidence, drawing permissible inferences, and passing upon the credibility of witnesses, all issues within the province of a jury. The motion for an instructed verdict and for judgment were properly overruled.

This limits our task to examining the record to determine whether any substantial error, prejudicial to the rights of the appellant intervened in the manner of their submission to the jury. That will be discussed after considering the third and last count, upon which the appellant was found guilty.

(3) In the next count against the appellant, and upon which he was convicted, the State charged that from on or about January 1st, 1941 to on or about July 1st, 1944, the appellant unlawfully and corruptly accepted large sums of money from Joseph Parisi and Ralph Schear with intent to influence him in the discharge of his duties as prosecuting attorney.

In addition to the relation of Parisi to the transfer of the second automobile to the appellant, which was the subject of a separate count, the only other evidence in proof of benefits received by appellant from Parisi or Schear, or either, was that Parisi entered a store in Dayton with appellant and introduced him to one of the proprietors, to whom appellant talked about buying a piano, a deep freeze, and perhaps some other articles, but bought nothing on that occasion. About a month later, in response to a call from the store-keeper, the appellant returned alone, and bought and paid cash for the articles and on subsequent occasions made purchases over a period of more than a year and always paid cash. The total purchases consisting of household equipment amounted to about $850.00. The only relation of Parisi to these transactions was that he introduced the appellant to the store-keeper.

There was evidence of other purchases from other stores, but there was no evidence that Parisi or Schear had any connection with them. The only evidential value of that testimony was as reflecting upon the amount of money spent by appellant during the period.

There was also evidence that the appellant visited the Silver Dollar two or three times a month for a period of more than a year.

The only other evidence having any relation to this count concerned the amount of money that passed through appellant's bank account.

With the data of money handled before him, a comparison was made with appellant's known sources of income by an expert who testified that there was an excess of expenditures over known income of more than $12,000.00 during the period from January 1st, 1941 to June 30th, 1944.

The accuracy of the expert's analysis was challenged by the appellant and evidence was offered on his behalf accounting for income for which he had not been credited by the expert and tending to prove that all money received by him during the period came from sources other than Parisi or Schear. The appellant denied that he had ever received any sum whatsoever from either Parisi or Schear.

The state of the evidence presented an issue of whether the State had proven a total income larger than the items from known sources.

The legal question presented is whether the jury having found that the total income was larger than from known sources could draw the conclusion that the excess represented money paid appellant by Parisi or Schear to influence appellant in the discharge of his duty as prosecuting attorney.

What is the evidence that leads the mind to the conclusion that the excess of money came from Parisi or Schear?

Certainly, the automobile transaction does not furnish any such clue. The theory of the State was that it was the automobile and not money that was the bribe—and appellant was convicted of accepting the automobile as a bribe. It cannot under such circumstances be considered that the money that Parisi paid for the automobile, used as a bribe, was also evidence of money paid as a bribe.

We are also of the opinion that the fact that Parisi introduced the appellant to a merchant, and the fact that he visited the Silver Dollar furnished no basis for the inference that money had been given and received as a bribe. There is no logical or natural connection between the premise and the claimed conclusion.

We are further of the opinion that even though it should be found that the evidence showed that the appellant handled money, the source of which was unexplained, still that would be no evidence that the unexplained portion was received as a bribe. The record would simply show that the source of some of the money was known and some unknown. That means only that there was a failure of proof—and a failure of proof can never take the place of proof.

Finally, we are of the opinion that all these items, lacking in evidential value when taken separately, are equally lacking when taken in combination.

While circumstantial evidence may satisfactorily prove a fact in issue, that must result from the natural, usual, and logical conclusions to be drawn from the circumstances and cannot be extended beyond that. Findings of fact must be kept within the bounds of rationality. Reasoning cannot be extended beyond the evidence by piling inference upon inference. U. S. v Ross, 92 U. S., 281; Sobolovitz v Lubric Oil Co., 107 Oh St 204; Cunard S. S. Co. v Kelley, 126 Fed., 610.

Upon this subject of keeping judicial reasoning within the limits of reason, Thayer in his Preliminary Treatise on Evidence says at page 208:

"Especially has this function come into play in supervising and regulating the exercise of the jury's office. Herein lies one of the most searching and far-reaching occasions for judicial control—that of keeping the jury within the bounds of reason. This duty, as well as that of preserving discipline and order, belongs to the judge in his mere capacity of presiding officer in the exercise of judicature. Reason is not so much a part of the law, as it is the element wherein it lives and works; those who have to administer the law can neither see, nor move, nor breathe without it. Therefore, not merely must the jury's verdict be conformable to legal rules, but it must be defensible in point of sense; it must not be absurd or whimsical. This, of course, is a different thing from imposing upon the jury the judge's own private standard of what is reasonable."

The same necessity is pointed out in different nomenclature in 20 Am. Jur., 163:

"A presumption cannot ordinarily be raised from some fact proved unless a rational connection exists between such fact and the ultimate fact presumed.—Furthermore, a fact can be regarded as the basis of an inference only where the

inference is a probable or natural explanation of the fact. Inferences may not be drawn from one transaction to another that is not specifically connected with it, merely because the two resemble each other, but must be linked together by the chain of cause and effect and common experience."

These tests disclose that the verdict of guilty of accepting money as a bribe is supported not by evidence proving the fact, but only by speculation, conjecture, and suspicion.

(4) The State called Dorothy Miller as a witness and she was permitted to testify over the objection of the appellant that Parisi told her in process of settling an action against him and others to recover money lost at gambling: "You know we have things fixed with the prosecuting attorney and the sheriff," and that they were the prosecuting attorney and Sheriff of Springfield.

The State called one Melvin Thomas as a witness. He was a partner of Parisi and Schear in the operation of the Silver Dollar Club, and was the manager of the enterprise and received twenty-five per cent of the profits. On direct examination, he was asked: "Didn't you make a statement to a Mrs. Miller the reason that you moved to Clark County was because you had things fixed with the sheriff and prosecuting attorney of Clark County?" Over the objection of the appellant, he was permitted to answer, and his answer was in the negative. The question was repeated and over the appellant's repeated objection, the witness was directed to answer, which he did by denying that he had ever made such a statement.

The Court based its ruling at this time on the theory that the State had been taken by surprise and that the witness was hostile.

It is familiar law that permission to ask leading questions on direct examination rests largely in the discretion of the court and when it appears that the witness is hostile or that counsel has been surprised by the witness' testimony, the courts are prone to exercise that discretion in favor of the examiner so as to enable him to exhaust the witness' knowledge of the facts. **42 O Jur 320, et seq.** But that relates to the manner of eliciting competent evidence. It does not enlarge the limits of competency so as to permit the introduction of evidence which would otherwise be incompetent. It doesn't make hearsay evidence competent.

If the method pursued was for the purpose of refreshing recollection or of breaking through the hostility of the wit-

ness, then no matter whether the method pursued had been successful or otherwise, the incident would be closed. **Hurley v State, 46 Oh St 320.** The examiner would be bound by the answer in the sense that evidence by way of impeachment would not thereby be rendered competent.

However, in this case, it seems that the State at the time contemplated calling Dorothy Miller, and in fact did call her for the purpose of proving that Thomas had made that statement to her, and the Court, over the appellant's objection, permited her to so testify.

Now, clearly, that could not be justified on the basis of impeachment. It would violate the rule that a party is not permitted to impeach his own witness. Furthermore, as impeaching evidence its effect would be limited to affecting Thomas' credibility. It would not be evidence at all of the truth of the substance of the impeaching statement. **State v Duffy, 134 Oh St 16.**

Justification for the ruling as to both the Parisi and Thomas statements is sought to be based on the theory that the evidence shows that Parisi and Thomas, and appellant were co-conspirators and that therefore, the declarations of each in pursuance of the common design were admissible against the other as substantive evidence. It should be observed here that if the evidence showed that they and appellant were co-conspirators, no other foundation for the admissibility of their statements in pursuance of the common design would be necessary. And what they said as co-conspirators would be substantive evidence of the facts.

Now is there any evidence that they and appellant were participants in a common conspiracy in pursuance of which Thomas made this statement to Dorothy Miller?

The indictment contains no count in which Parisi and Schear are joined with the appellant in the commission of a crime. There is no count which joins Thomas with appellant. In certain counts Parisi and Schear are accused of giving bribes. In other counts the appellant is accused of accepting bribes.

Certainly, the evidence does not go beyond the accusations in this respect. There is no evidence that the appellant as a co-conspirator of Parisi, Schear and Thomas engaged in the operation of the Silver Dollar Club or any other gambling enterprise.

(5) The question then is—whether the unsworn, extra-judicial declarations of conspirators engaged in violating the law, are competent upon the trial of a prosecuting attorney charged with having been bribed by them to neglect his duty

to enforce the law against them.    It is clear that they would not be regarded as co-conspirators at common law.

' In the case of Gebardi v U. S., 287 U. S. 112, 84 A. L. R., 370, a Mann Act case, the Court says at page 375 of the latter report:

"If this were the only case covered by the Act, it would be within those decisions which hold, consistently with the theory upon which conspiracies are punished, that where it is impossible under any circumstances to commit the substantive offense without cooperative action, the preliminary agreement between the same parties to commit the offense is not an indictable conspiracy at common law. Shannon v Com. 14 Pa. 226; Miles v State, 58 Ala. 390; cf. State v Law, 189 Iowa, 910, 11 A. L. R. 194, 179 N. W. 145; see State ex rel. Durner v Huegin, 110 Wis. 189, 243, 62 L. R. A. 700, 85 N. W. 1046 15 Am. Crim. Rep."

To the same effect is People v Wettengel, et al., 104 A. L. R. (Cole.) 1423, the syllabus of which is:

"Where the concerted action of the giver and the taker is essential to constitute the crime of bribery, an indictment will not lie for conspiracy to commit bribery if the conspiracy is charged to have included both the prospective giver and the prospective receiver, although several persons are involved, as prospective givers, in the alleged conspiracy."

In 8 Am. Jur, 896, it is stated that:

"Assuming that concert of action of the giver and the taker is essential to constitute the crime of bribery, there is no such crime as conspiracy to commit bribery where the persons charged as conspirators are the prospective giver and the prospective receiver."

We are therefore of the opinion that there was no proof of a conspiracy between the appellant and Thomas or Parisi or Schear, and that, therefore, statements made by either in the absence of the appellant were not competent evidence against him.

We also are of the opinion that the statements offered in evidence were recitals of past occurrences not made to further any common purpose, and for that reason were incompetent.

(9)    The court permitted a witness to testify to the results of an analysis of the income tax returns of Parisi and

Schear for the years 1941, 1942, 1943, and 1944. The data for these returns was furnished by a bookkeeper of Parisi and Schear. It was in evidence that Parisi had a business in Montgomery County, and that his business extended over several counties. It was not claimed that the appellant had any interest in any way in the Montgomery County business, and there was no proof that he had any interest as partner or otherwise in any business transacted by Parisi or Schear anywhere: The evidence was admitted presumably to show the extent of gambling in Clark County. It did show that Parisi and Schear had a large income during those years. It did not show that that income resulted from gambling and particularly from gambling in Clark County. No attempt was made to connect appellant with the making of these income tax returns, and we are clear that the evidence was incompetent as declarations by co-conspirators because of lack of evidence of a conspiracy of which appellant was a member, and also because the income tax returns of the individuals could not possibly be regarded as made in pursuance of the purpose of a conspiracy. The returns were made to comply with the Income Tax Law. There was no other purpose. The appellant was not bound by them in any way.

(6) The appellant attacked the indictment against him by a plea in abatement, based on the procedure followed in the appointment of Simon L. Leis, Attorney, to represent the State as assistant prosecuting attorney, in assisting the grand jury in the investigation which resulted in the return of this indictment. It was recited in the order that it was made under authority of §2912, GC. The record shows that the Common Pleas Court Judge signed the entry appointing Mr. Leis on October 2nd, 1944, and this entry was stamped by the clerk as having been filed on that day, and was then returned to the custody of the judge who held it until December 5th, 1944, when it was entered upon the journal in space under that date which had been reserved for that purpose. In the meantime, Mr. Leis had taken the oath and given the bond required of him and had actively assisted the grand jury in its investigation which resulted in the return of this indictment. No notation upon the court records of the taking of the oath or the giving of the bond was made until at or about the time of the return of the indictment.

While no formal notice was given appellant and no opportunity to be heard formally given, there is abundant evidence that appellant knew of the court's intention to appoint, and that the appointment had been made and that Mr. Leis was acting in the capacity of prosecuting attorney and acquiesced therein.

The plea in abatement is based solely on the contention that because of the irregularity in the appointment, Mr. Leis had no title to the office, the duties of which he assumed to discharge. It is not claimed that what he did would have been beyond the power or duty of a duly appointed prosecuting attorney.

Reliance is placed upon the case of State, ex rel. v Henderson, 123 Oh St 474, in which under somewhat similar circumstances, the Court held that the prosecuting attorney was entitled to notice and an opportunity to be heard before such an appointment could be made. But that was a direct action by the State in quo warranto to test the title to the office. In the case at bar it is sought to invalidate the action of the grand jury because of a defect in the title of the prosecuting attorney. In our view, this case falls into a different category from that of State, ex rel. v Henderson, even as to the title of the office in question. It involves action under color of office of an occupant claiming title thereto.

In 32 Oh Jur 1096, it is stated:

"The general rule is that the acts of a de facto officer are to be upheld as valid, in so far as they involve the interests of the public and of third persons, until his title to the office is adjudged insufficient. The acts of a de facto officer, however, must comply with the requirement of applicable law, to the same extent and in the same manner as the valid acts of de jure officers. Third persons are not supposed to know whether an officer has taken every necessary step to qualify himself, and therefore, it is sufficient for them to show that he is such de facto.

"One important consequence of the rule that the acts of a de facto public officer are valid as far as the public and third persons are concerned is that the official acts of a de facto officer cannot be collaterally attacked."

We think the facts in this case bring it within the stated principle and that the plea in abatement was properly overruled. Whether the prosecuting attorney was de facto or de jure, in either event he occupied the office, and his acts should be judged by the same standard.

(7) The evidence was conflicting as to whether the Silver Dollar Club was located in Clark County or Greene County. It is earnestly contended that this geographical dispute must be decided in order to determine jurisdiction and venue. We

do..not think so. The duty of the prosecuting atorney to inquire into commission of crime within his territorial jursdiction involved the duty to determine the boundaries of the county and the corrupt acceptance of money to influence that decision, so as to exclude gambling at a certain place from the field of his duty would be bribery, and it would be none the less so even though it might thereafter appear that the site was outside the county.

(8) Another error assigned is that one of the attorneys for the State was guilty of misconduct in his argument to the jury. A reading of this argument leads to the conclusion that the jury could readily infer that the speaker was basing his opinion of guilt on an investigation made by him, and not solely on the evidence adduced at the trial. This method of argument was denounced in **State v Thayer, 124 Oh St 1.**

There were other instances. in which the prosecutors made reference to incidents of the war, having no relation to this case. These tended to divert the jury from the issues and to inflame the passions. Whether these incidents were so prejudicial as to require a reversal in a case where guilt is clear might be questioned, but we think they were prejudicial in this case, and should not be repeated on a retrial.

There are other assignments of error, but we find none of a substantial and prejudicial nature, except those already discussed.

For these reasons, the judgment is reversed, and the appellant ordered dismissed on the second and sixth counts in the indictment, and the cause remanded for a new trial upon the fourth count of the indictment.

HILDEBRANT, P. J., MATTHEWS and ROSS, J. J., concur in the syllabus, opinion and judgment.