## UNITED STATES v. LE DUC.
### No. 8989.

Circuit Court of Appeals, Eighth Circuit.
March 19, 1931.

Joseph W. Finley, Asst. U. S. Atty., of St. Paul, Minn. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., J. H. Fraine, Regional Atty., U. S. Veterans' Bureau, of Minneapolis, Minn., and H. R. Pool, Atty. U. S. Veterans' Bureau, of Hines, Ill., on the brief), for the United States.

L. B. Schwartz, of Minneapolis, Minn. (Schwartz & Halpern, of Minneapolis, Minn., on the brief), for appellee.

Before STONE and GARDNER, Circuit Judges, and WOODROUGH, District Judge.

GARDNER, Circuit Judge.

This is an appeal by the United States from a judgment against it on a policy of war risk insurance. The parties will be referred to as they appeared in the lower court. Roy Le Duc, while in active military service during the World War, was granted war risk term insurance in the amount of $10,000, payable in the event of death or permanent and total disability occurring while the contract was in force, in monthly installments of $57.50 each. The plaintiff, Frank O. Le Duc, was designated as the beneficiary. Premiums were paid on the policy to and including May, 1919. At that time default in the payment of premiums occurred, and, by the terms of the contract, no benefits were payable unless the insured had become permanently and totally disabled prior to midnight July 1, 1919. Plaintiff alleged that the insured became permanently and totally disabled on July 8, 1918, and died therefrom December 23, 1926. The government, in its answer, admitted the issuance of the contract of insurance, the death of the insured, and in effect denied the other allegations of the complaint. The question contested in the lower court was whether the insured, on or prior to July 1, 1919, had become permanently and totally disabled.

At the close of all the testimony the government moved for a directed verdict in its favor, on the ground that there was no evidence to show that the insured was totally disabled at a period while his insurance contract was in force, nor to show that there was any reasonable assurance at that time that a condition of disability would continue throughout his life. This motion was denied, and the defendant excepted. The denial of the government's motion for a directed verdict is the controlling question presented on this appeal. The burden of proof to establish permanent and total disability while the insurance contract was in effect was upon the plaintiff. Claiming to act by virtue of authority conferred by section 13 of the War Risk Insurance Act, as added by Act Oct. 6, 1917, 40 Stat. 399, the Treasury Department issued Treasury Decision No. 20 W. R., defining the term "permanent and total disability" as follows: "Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed, in Articles III and IV, to be total

disability. 'Total disability' shall be deemed to be 'permanent' whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

Whether this pronouncement by the Treasury Department was authorized by congressional enactment and hence has the force and effect of law, we need not determine, because this court had adopted substantially the same rule as to total disability. In United States v. Phillips (C. C. A.) 44 F.(2d) 689, 691, in an opinion by Judge Kenyon, it is said: "The term 'total and permanent disability' does not mean that the party must be unable to do anything whatever; must either lie abed or sit in a chair and be cared for by others. The test laid down in the cases is well stated in United States v. Sligh (C. C. A.) 31 F.(2d) 735, 736, as follows: 'The term "total and permanent disability" obviously does not mean that there must be proof of absolute incapacity to do any work at all. It is enough if there is such impairment of capacity as to render it impossible for the disabled person to follow continuously any substantially gainful occupation.' " See, also, Blair v. United States (C. C. A.) 47 F.(2d) 109, 111.

Our inquiry is, therefore, directed to the question: Was the insured in the instant case, during the life of his policy, so impaired in health as to permanently disable him from following continuously any substantially gainful occupation?

It appears from the undisputed evidence that the insured was about nineteen years old when he was discharged from the Army in May, 1919. He returned to his home and remained there unemployed for about a month. He worked for three weeks in June, 1919, for Butler Bros. in Minneapolis, Minn. He worked steadily from July 8, 1919, to September 29, 1919, for the Minneapolis Steel & Machinery Company in Minneapolis as a sheet metal worker, riveter assembler and helper, quitting with the excuse that he was leaving town. He worked for six weeks in the fall of 1919 as a farm laborer in South Dakota. On December 29, 1919, he re-enlisted in the regular Army, and deserted August 29, 1920. In September, 1920, he worked for two or three weeks for the Steel Type Piston Ring Company of Minneapolis, and at a number of odd jobs during the fall of 1920. On January 27, 1921, he again re-enlisted in the Army under the name of Roy Moore, and again deserted August 31, 1922. He was then convicted of the larceny of an automobile and served a term of imprison-

ment in the reformatory at St. Cloud, Minn., from July 22, 1922, to July 7, 1925, when he was paroled. During his imprisonment he worked at manual labor in the stone quarry and stone shop from July 22, 1922, to July 20, 1923, and from March 4, 1924, to September 8, 1924. During the balance of the time covered by his sentence in the reformatory, he worked in the music department, the kitchen, and tailor shop, and attended school. Thereafter, from July 7, 1925, to January 23, 1926, he worked for the Minneapolis City Water Works as a laborer, digging ditches and putting in water pipes, at a daily wage of $5, and was laid off because the work was completed. Shortly afterwards, he was hospitalized, and died September 23, 1926, and the doctor who made an autopsy concluded that the pulmonary tuberculosis from which death resulted, had been relatively acute and rapid in its progress, continuing probably not over one year.

From the time of the insured's discharge in May, 1919, to the date of his death in 1926, his physical condition is fairly reflected as a matter of record. At the time of his discharge, the records indicate that he had no physical disability and no physical defects of any kind, other than a scar of appendectomy, which existed prior to enlistment. At the time of his second enlistment in December, 1919, he had a medical examination which indicated that he had several missing teeth and a scar of appendectomy. He remained in the service for some eight months with no hospitalization record, except that from January 18 to January 29, 1920, he was treated for influenza and from May 8, 1920, to July 13, 1920, he was treated for gonorrheal infection. On January 27, 1921, having previously deserted, he again enlisted and passed another medical examination. On his entrance to the reformatory on July 24, 1922, he passed a medical examination, and was examined repeatedly thereafter during his incarceration, and the doctor states that, "His physical condition at that time was very good, and from the findings I made at that time, I would say his condition was normal and his health normal." Throughout the entire period from the time of his discharge until shortly before his last illness, he was gainfully employed, and never unemployed at other times, so far as disclosed, except that the functional adviser at the reformatory says that he was in the hospital several times during his incarceration, saying, "I don't know how long or what for."

Against this record, members of the insured's family, including the plaintiff, testi-

fied that after the insured returned from service in May, 1919, his cheeks were sunken in, he had dark rings under his eyes, and had turned to sort of a copper color; he was short-winded, and on running half a block he was puffing as if it had been a mile, and after running half a block he leaned up against a street car and began to cough for a minute or so; his face was flushed and red, and he began to sweat; that whenever he did anything like running, he did not seem able to stand the strain; he complained of pain and was not as bright and peppy as he was before he went away; he coughed a good deal at night, his appetite was not good, he appeared to be bothered with stomach trouble, and he was very much run down and his vitality seemed low; he always complained of his stomach and never got rid of the cough; he had periods of constipation and diarrhea. Other members of the family testified to substantially the same effect, but on cross-examination it appeared, as it did from other testimony, that the insured was absent from home the greater part of the time, and that the witnesses had no personal knowledge of his health or physical condition during such periods of absence, particularly during his two enlistments in the Army and his term in the reformatory.

There was no proof that the insured had active tuberculosis contracted between July 19, 1918, and May 24, 1919. Plaintiff produced an expert who testified that he had examined certain X-ray films made of Roy Le Duc in January, 1926, at the United States Veterans' Bureau Hospital. This witness had never seen the insured, nor made any examination of him, but his testimony was based solely upon an examination of the X-ray pictures and upon certain assumed facts. Over objections that proper foundation had not been laid and that his testimony was immaterial and too remote, the witness was permitted to testify to certain conclusions based upon the X-ray pictures, to the effect that the pictures reflected an advanced tuberculosis, involving both lungs in their upper portions; that there was a large cavity in one lung, and an extensive fibrous scar formation in both lungs. The witness was then interrogated as follows: "Q. Can you upon an examination of the films, showing the condition of the lungs, determine with reasonable certainty as to the approximate time of the origin of such a disease as tuberculosis? A. We can within broad limits, that is, we can state something as to the minimum length of time that the disease was present, and much more roughly something as to the maximum length of time that the disease was present in some cases; not in all cases, but in many cases."

The witness further testified: "It is much more difficult to arrive at the approximate estimate as to the maximum length of time it was present, but it is not so difficult to arrive to a rough idea as to the minimum length of time."

The witness then stated that, from an examination of these X-ray pictures, he was of the opinion that the minimum time that Roy Le Duc had been suffering from active tuberculosis "would have been approximately two years." In answer to an interrogatory as to the maximum length of time, the witness stated: "That might also have been two years and it might have been ten years. You cannot say definitely. It might have been ten, or fifteen years—as I said before, the limits are much broader."

The witness then stated that in his opinion, the insured was suffering from active tuberculosis prior to January 1, 1925. He was then asked the following hypothetical question: "Now, assuming that this boy had active tuberculosis between—or contracted it between July, 1918, and the 24th of May, 1919, and assuming that he was suffering from active tuberculosis originating back there in 1918, or between those two dates, Doctor, and taking into consideration the advanced state of the development of that disease, in the form that it existed in January, 1926, and taking into consideration and assuming also that this boy died as the result of active tuberculosis, several months after January, 1926, or I think it was the 29th or the 23rd of September, 1926, can you form an opinion as to whether or not at any time prior to, let us say, the 31st, or at any time prior to the 1st of July, 1919, whether or not he was so suffering with active tuberculosis, Doctor, can you form an opinion whether or not this boy was suffering from such an impairment of body or mind, which rendered it impossible for him to follow continuously any substantially gainful occupation, without risking his life?"

The witness, answering in the affirmative, stated his opinion as follows: "Well, I will state again, that with the presence of active tuberculosis there is always disability, and if he had active tuberculosis in 1919, he was injuring his life if he continued to work."

Now, it is observed first that there was no proof that the insured had active tuberculosis contracted between July, 1918, and May 24, 1919, or prior to July 1, 1919, and

it is further noted that the question asked the witness to testify to a fact which in substance the question assumed; in other words, the question answered itself. Dr. McDonald testified that he had examined the insured in December, 1925, and that at that time he had tuberculosis in an advanced stage, and that he did not think his lungs could have become as they were when he made the examination within a year, and hence was of the opinion that the insured was afflicted with active tuberculosis prior to January 1, 1925. This, with the testimony of Dr. Rigler, already referred to, based upon an examination of X-ray films in January, 1926, was the only medical testimony produced on behalf of the plaintiff. Doubtless what counsel had in mind was to show by medical testimony that the insured was suffering from active tuberculosis prior to January 1, 1925, hoping to invoke the presumption created by section 471, title 38, USCA, which provides, among other things, that an ex-service man who is shown to have had, prior to January 1, 1925, an active tuberculosis disease developing a 10 per-centum degree of disability or more, in accordance with the provisions of subdivision 4 of section 202 of the act (38 USCA § 474), should be presumed to have acquired his disability in such service between April 6, 1917, and July 2, 1921, such presumption being conclusive in cases of active tuberculosis. Although a matter of considerable doubt in our minds, this provision of the statute has been held to apply to insurance cases as well as compensation cases. United States v. Eliasson (C. C. A.) 20 F.(2d) 821; Brandaw v. United States (C. C. A.) 35 F.(2d) 181; Runkle v. United States (C. C. A.) 42 F.(2d) 804.

The presumption invoked, assuming it to be applicable, goes to the source and time of acquiring the disability, and not to the degree, extent, or permanency of the disability acquired. If, therefore, full effect be given the presumption, it cannot be said that it has the effect of supplying proof of permanent and total disability during the life of the policy. Starting then with a presumption that the insured acquired his disability while in service in the Army and while his policy was still in force and effect, we are confronted with certain undisputed facts which occurred subsequent to the time of his discharge. He was twice re-enlisted in the United States Army, passing the medical examinations required, and the statute provides that only able-bodied men shall be permitted to enlist. This proof conclusively precludes the plaintiff from contending that the disability ac-

quired while in the service was permanent. It had certainly been arrested at the time of these re-enlistments.

Ordinarily, a presumption cannot be weighed in the balance against facts, and there is no medical testimony showing that any physician ever found the insured suffering with tuberculosis until December, 1925. Granting that the presumption was properly invoked, it would not, as already pointed out, sustain the contention that the insured became totally and permanently disabled while the insurance contract was in force. Generally speaking, tuberculosis is a progressive disease, totally disabling only when it reaches certain advanced stages. In its incipiency, disability may not be present at all. The statute furnishes no presumption as to the degree of disability, either in service or at any subsequent time. Even the testimony of Dr. McDonald furnishes no support for the contention that the insured was permanently and totally disabled within the meaning of that term while his contract of insurance was in force, and the record conclusively shows that the insured was not totally and permanently disabled before July 1, 1919. His work record and his medical record refute any such possible contention. The medical testimony shows that he was free from tuberculosis on May 24, 1919, at the time of his first discharge from the Army; that he was still free from the disease when he re-enlisted in the Army on December 29, 1919, successfully passing the medical examination. He was still free from this disease on January 27, 1921, when he again re-enlisted and passed the medical examination. He was free from the disease when he entered the reformatory in 1922 and passed the medical examination, and during all the years until 1925 he was, not only not permanently disabled, but was continuously following a substantially gainful occupation.

After all, the right of recovery in these war risk insurance cases is dependent on contract, and it is not within the province of the jury to award from the public funds gratuities to relatives of deceased ex-soldiers; neither can we, under the guise of liberal construction, close our eyes to the undisputed facts disclosed by the record in this case and sustain this verdict on the theory of a constructive, permanent, total disability, which finds support only in a series of superimposed retroactive presumptions. As said by this court in Blair v. United States, supra: "For a court to find under this evidence that prior to March 31, 1919, appellant was to-

tally and permanently disabled would be a mere guess, unsupported by any substantial evidence."

There is, in our opinion, no substantial testimony sustaining this verdict. At most, it is based upon untenable theories, speculation, guess, conjecture, and surmise.

The judgment is therefore reversed, and the cause remanded, with directions to grant the defendant a new trial.