## NATIONS v. UNITED STATES.
### No. 9128.

Circuit Court of Appeals, Eighth Circuit.
Aug. 6, 1931.

P. H. Cullen, of St. Louis, Mo. (Charles M. Hay and Abbott, Fauntleroy, Cullen & Edwards, all of St. Louis, Mo., on the brief), for appellant.

Louis H. Breuer, U. S. Atty., of Rolla, Mo., and John C. Dyott, Sp. Asst. to Atty. Gen. (Louise Foster, Sp. Asst. to Atty. Gen., on the brief), for the United States.

Before STONE and GARDNER, Circuit Judges, and MARTINEAU, District Judge.

STONE, Circuit Judge.

This is an appeal from a conviction for conspiring to violate the National Prohibition Act. Appellant urges here several claimed errors.

## I. Venue.

One contention is that the court erred in denying a motion to transfer this case, for trial, from the Eastern Division to the Northern Division of the district. The basis of the motion was the prejudice of the inhabitants of the Eastern Division. This motion was supported by many affidavits and several volumes of clippings from newspapers published in that division. The government filed a large number of affidavits in opposition. The trial court denied this motion and filed a memorandum setting forth three grounds for its action. These grounds are as follows: First, that the transfer is sought under section 114 of title 28, USCA, and that section is not a change of venue statute; second, that if such section is authority for changes of venue, a determination of a motion for such change rests in the sound discretion of the trial judge and the presentation in support of such motion does not here justify a change; third, that the motion is filed out of time.

Counsel urgently contend here that the motion should have been granted because the appellant is assured the right to a fair and impartial jury by the Constitution (Sixth Amendment) and the statutes (USCA, title 28, §§ 71 and 114) of the United States, and that the showing here clearly proved such prejudice within the Eastern Division as to require a transfer in order to secure an impartial jury.

It is unnecessary to determine how far the constitutional and statutory provisions relied upon are effective or here applicable. We think the court was clearly right in denying the motion because the application was not filed in time. Supposing (but not deciding) that the Sixth Amendment or the cited statutes, or both, authorize a change of venue where such is shown to be necessary to secure an impartial jury or trial, yet the motion or application therefor must be seasonably made. There is no suggestion in the amend-

ment or in either of the above sections of the statutes as to the time when such applications must be filed, but courts may announce principles in matters of practice in order to insure orderly procedure and individuals may waive rights accorded for their protection even though such rights be announced in a Constitution. A familiar instance is the well-established rule that a motion to suppress evidence on the ground of unlawful search and seizure must be seasonably made or the right will be deemed waived. Segurola v. U. S., 275 U. S. 106, 111, 112, 48 S. Ct. 77, 72 L. Ed. 186; Gouled v. U. S., 255 U. S. 298, 305, 41 S. Ct. 261, 65 L. Ed. 647; Weeks v. U. S., 232 U. S. 383, 395, 396, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Day v. U. S., 31 F.(2d) 71, 72–73, this court.

The law permits the use of a protective privilege only so far as necessary for protection and will see that it is not stretched into an abuse. The clear facts here show the need of the rule that applications of this character must be seasonably filed. This indictment was returned January 19, 1925. There have been two trials and two appeals before the present trial. (C. C. A.) 14 F. (2d) 507; (C. C. A.) 32 F.(2d) 598. The theory of the motion and of the supporting proof is that there is a hostile public feeling built up by the newspapers in St. Louis. There are many newspaper articles and some cartoons introduced but, with one exception, all appeared between January, 1922, and July 22, 1925. The exception is a publication on August 14, 1929. It is thus clear that most of this propaganda, which is supposed to have aroused the adverse sentiment, ceased about four and a half years before this application was filed (on January 2, 1930) and that the sole exception was about four and one-half months before such filing. The present trial was set for November 11, 1929, and then, at the instance of appellant, reset for January 7, 1930, yet this motion was not filed until January 2, 1930. There is no statement of any excuse for such delay. In the very nature of things, this prejudice must have been known to appellant years before and would naturally have been more pronounced during or shortly after the time when the newspaper articles were appearing, yet he suffered two trials and waited years until he was upon the threshold of a third trial before any motion of this character was filed. Whether such motion is "seasonably" filed must depend upon the circumstances of each case, having in mind such matters as when

the prejudice arose, when it was discovered, and what effect the allowance of the motion would have upon the progress of the case. But by any rule; the undisputed situation here shows inexcusable delay and such is fatal to the right, if it exists.

## II. Grand Jury.

It is urged that the indictment should be abated and quashed for a number of reasons stated in an amended motion. Only one ground is argued here, which is the presence of John C. Dyott, Special Assistant to the Attorney General, before the grand jury in connection with its consideration of this case. The supposed vice of such appearance is argued from several angles. We need not determine any of the matters thus argued because this motion and the amended motion were clearly filed out of time. This indictment contained the indorsement, "John C. Dyott Spec. Asst. Atty. General," and there was no other endorsement except that of the foreman of the grand jury and of the clerk (as to filing). This indictment was filed January 19, 1925. Shortly after this date, appellant must have been apprised, by this indorsement, if not otherwise, that Mr. Dyott had been in charge of presenting this matter to the grand jury and that he purported to act as a Special Assistant Attorney General and not otherwise. Without any objection of this character to the indictment or the actions of Mr. Dyott, appellant went through two trials, and it was not until he was approaching a third trial, nearly four years after the indictment had been filed, that he makes this attack. In the orderly administration of justice, there has been announced a rule of practice that motions of this character, striking at the action of a grand jury in returning an indictment, must be seasonably filed or the right so to object is deemed waived. Some of such cases are Agnew v. U. S., 165 U. S. 36, 44, 17 S. Ct. 235, 41 L. Ed. 624; and, in this court, Shaw v. U. S., 1 F. (2d) 199, 201, and Moffatt v. U. S., 232 F. 522, 528.

Appellant seeks to avoid the obvious application of this rule by claiming that he had no means of knowing the contents and limits of Mr. Dyott's authority until that authority was filed, which was on December 19, 1929, and that his amended motion was filed, within a reasonable time thereafter, on December 27, 1929. Clearly, "seasonableness," as applied to the filing of such character of motions, is governed, inter alia, by when the movant first knew of the grounds of the motion. If it can be said that the knowledge here was first obtained by appellant on December 19th, it might well be that the filing on December 27th, following, was in time. However, the appellant had known Mr. Dyott's connection with the case for nearly four years; that no authority had been filed and no qualification shown anywhere in the progress of the case. Also, he knew he could have questioned this authority and required establishment thereof. Also, the original motion, filed November 11, 1929, specifically attacked this authority more than a month before counsel now claim in argument the authority was known to appellant. Also, no reason is shown, nor could be shown, why appellant could not and did not test this matter in the earliest stages of this litigation.

In most legal situations, a duty to know is equivalent to knowledge, and here appellant was certainly long apprised of a situation which would have invited his prompt attention had he attached any importance thereto. He was not deceived nor was anything done by the government to dull or delay such investigation by him. The obvious truth is that no importance was attached to this matter and nothing done until long after the law required it should receive attention. The above rule clearly governs this situation against the present contention of appellant.

## III. Indictment.

Appellant filed a demurrer to the indictment on several grounds, one of which was that it contained scandalous and impertinent matters without the purview of the crime charged and which matters were highly prejudicial. The matters thus intended were allegations as to the official positions and official duties of appellant and of Prather, respectively, as State Commissioner of Labor and as State Beverage Inspector. The court overruled the demurrer. Thereafter, appellant filed a motion to expunge the same matter. The court viewed this matter as irrelevant and sustained such motion "to this extent: That the District Attorney is directed to omit the reading of Paragraph 2 and Paragraph 3 [the matter involved] of the indictment in the presence of the jury," and that if the indictment should be given the jury, those two paragraphs would be eliminated. The reading of the indictment to the jury was then formally waived by appellant. Thereafter, appellant objected to any opening statement "in the absence of the indictment being stated or laid before the jury." The court then directed the reading of the indictment with the above matter omitted "as surplusage."

The contention now made is that this action of the court operated as a change or alteration of the indictment returned by the grand jury, and that such "amendment" of the indictment destroyed it and, therefore, the appellant was not tried upon the indictment returned which was the only charge upon which he could be tried. This very contention was before this court on the second appeal and then determined adversely to appellant. 32 F.(2d) 598, 599. We see no reason for departing from the view then expressed and rule the present contention against appellant now.

## IV. Jurors.

 Appellant attacks the action of the court in overruling his challenge for cause of the jurors Catlett and Fink. The court was clearly right in its action regarding Catlett, as no sufficient ground appears in the record for questioning the competency of him as a juror. The challenge as to Fink is more serious. While the examination of Fink showed no prejudice against this particular accused, yet it showed an experience and environment which might very naturally nurture a prejudice against those actively in favor, in any way, of prohibition. This juror had, for twenty years, been a bartender, and was such when national prohibition came. He was also employed by a relative of his former employer and a part of his duties were selling the very newspapers which were actively hostile to accused. Within certain limits, the trial court must necessarily have a discretion in overruling challenges for cause to jurors and unless it appears rather clearly that such discretion has been abused to the prejudice of a party, it should be sustained. Here, the action of the trial court is not such as to amount to reversible error or, possibly, even to error, although the court might well have exercised the discretion differently. This point must be ruled against appellant.

## V. Argument.

 This is an attack upon an occurrence during the argument of counsel for defendant. The main witness for the prosecution was a codefendant, Charlie Prather, who had pleaded guilty but had not been sentenced. In connection with that witness, counsel for defendant stated in argument, and the following occurred:

"Mr. Cullen: But before going into that let me say one thing to you, and I want to say, with an emphasis that will shrivel the falsehood from the souls of men and that is: the very day that the United States Government called Charlie Prather as a witness—the very day the United States Government called Griesedieck as a witness, that day they made it impossible for the United States Government to ever prosecute him again; and if they challenge that statement, I lay before the Court and jury the book.

"Mr. Breuer: If the Court please, if he means by that, it is not possible for any further sentence to be imposed against Mr. Prather, we do challenge that fact.

"Mr. Cullen: I stand by my statement, under the law. Call your Honor's attention to the opinion by Judge Dean of the Oregon District, where the identical question was passed on.

"The Court: I don't understand there is anything for the Court to rule on, now.

"To the action of the Court defendant excepted."

The contention now made is that the action of the United States Attorney in challenging the statement of counsel was unwarranted and contrary to law, and that the failure of the court to rule upon the question emphasized this challenge and was extremely prejudicial. The challenge was invited and counsel was not entitled, as a matter of right, to have the court say whether his position was correct or not. Also, the court truly said that there was nothing for the court to rule on then. No objection was made by counsel to the statement of the United States Attorney and there was no necessity for action by the court. This point must be ruled against appellant.

## VI. Evidence as to Activity of Prohibition Agents.

 This contention has to do with the admission, over objection by appellant, of evidence of an attempted raid of the Griesedieck Brewery by general prohibition agents on February 21, 1924. These general agents were entirely unconnected with and independent of Gus Nations or the men under him.

To understand the place in the case of this evidence, it is necessary, very briefly, to sketch the theories of the government and of the defense and the evidence in support of those theories. The personnel important here is as follows: Appellant held the office of State Labor Commissioner, was the publisher of a newspaper in Jefferson City, Mo., and an avowed and active supporter of prohibition. He was a brother of Gus Nations who was in charge of the federal prohibition agents in St. Louis and legal adviser in Mis-

souri as to prohibition permits. The Griesedieck Brewery was a large brewery in St. Louis which was engaged in brewing beer when national prohibition became effective. At the time here involved, it was operating under a permit which allowed it to make beer and, after dealcoholizing it, to sell it as "near beer." Raymond B. Griesedieck was vice president of the company and one of its managing officers. Charles S. Prather was Food and Drug Commissioner of the State and a friend of appellant.

The theory of the government is that appellant initiated a conspiracy of himself, Prather, and Griesedieck whereby he would ascertain when his brother Gus and his agents would be employed elsewhere and it would be safe for the brewery to send out real beer; Prather would communicate that information to Griesedieck; the brewery would put out the beer and Griesedieck would pay Prather one dollar a case for such beer, to be divided between him and appellant; that this conspiracy originated late in April or early in May, 1923, and beer was sent out and payments made at various dates beginning May 15, 1923, and ending February 21, 1924, when the brewery was raided and the conspiracy ended.

The theory of appellant is that he was not engaged in any such conspiracy and was ignorant of any such arrangement between Griesedieck and Prather. He claims he was very much interested in aiding his brother to catch this brewery in illegal operations and that his connection with Prather was for the purpose of securing information which would lead to such result. The reasons for his interest and activity were as follows: A permit had been issued the brewery in 1921 and shortly thereafter it was caught sending out illegal beer and the permit revoked. Shortly after this first permit had been revoked, it applied for another permit. Gus Nations recommended the permit be not granted as he had no confidence in the good faith of the operators of the brewery which had violated the former permit. Some pressure was brought to bear upon him, from Washington, to have him reverse his recommendation. This he refused to do. However, the permit was issued over his disapproval. He was irritated by this procedure and particularly desirous of catching this brewery in violations in order to justify his view and position. Also, he had been informed that breweries in St. Louis, including this one, were sending out beer freely and there was some criticism of his failure to stop them. As the brewery

was authorized, by permit, to make real beer (dealcoholized before sale) and thus have it on the premises and as the violations were not regular and constant it was difficult to catch it sending out the real beer. It was necessary to have "inside" information of when beer was to be sent out. Appellant was endeavoring to secure such information for his brother so that a raid might be made and the brewery caught. He hoped that this might be obtained through Prather and, therefore, had him get in touch with Griesedieck.

The evidence of each party supported the respective theories. The main evidence for the government, of the connection of appellant with the conspiracy, was from Prather who testified to the arrangement between him, appellant, and Griesedieck; the receipt of the bribe money by him from Griesedieck; turning over thereof by him to appellant who gave him one-third and retained two-thirds for himself. Also, by Griesedieck who testified to the arrangement between himself and Prather and the procedure thereunder. Neither Prather nor Griesedieck claimed that any meeting or direct communication between appellant and Griesedieck had taken place. The main evidence for appellant was by himself, his brother, and an uncle, M. H. McFarland. Appellant and his brother testified to the arrangement whereby appellant was to endeavor to secure this "inside" information. Appellant testified to procuring the co-operation of Prather for that purpose and of McFarland in a particular instance which bears upon the evidence now under discussion.

With this bare outline of the theories and general supporting evidence thereof, we proceed, more in detail, to the evidence having particularly to do with that now being challenged. The evidence of Gus Nations is that on the 8th or 9th of January, 1924, appellant telephoned him that he had information that Griesedieck beer was being sold at two saloons, one of which was that of Buck Keenan. The next day or the day thereafter, these saloons were raided, beer found, and arrests made. He was unable to prove the source of the beer found and so notified appellant and impressed upon him the necessity of having *"advance* information when the beer will run" and suggested that appellant's informant "find out a day or two in advance when Buck will have beer again," and stated, "That will enable me to know when to 'mount guard', and any suspicious circumstance that occurs will warrant taking the chance of a raid"—all of this was in a letter written by

him to appellant early in February, 1924. Buck Keenan's saloon was on the first floor of an office building where, on an upper floor, was the St. Louis office of appellant as Labor Commissioner. McFarland was an employee of that office and often got his lunches at Keenan's. About February 10, 1924, appellant asked McFarland to try to find out when Keenan would have beer. On the 18th, while at lunch there, McFarland ascertained that Keenan would have beer on "Thursday and Friday" (February 21st and 22d). He immediately wrote this information to appellant at Jefferson City. The letter was received there the 19th. On February 19, 1924, a short while before Gus Nations was leaving for Kansas City, appellant, from Jefferson City, called him at St. Louis saying he would be down to St. Louis to see him next day. On being informed that Gus would be in Kansas City next day, appellant said he would communicate with Gus there. In the afternoon of the 20th of February, and at Kansas City, Gus received a letter from appellant stating: "The breweries run when you are out of town. * * * I also have pretty definite information that Griesedieck beer will flow either Thursday or Friday. You should slip back quietly but quickly as possible and watch for them." That night Gus returned to St. Louis, arriving at his office about 8 o'clock in the morning. He took four men from his force and raided the brewery about 9 o'clock, finding beer going out and arresting about forty men employed there.

The importance of this evidence as to this raid and its inciting cause is obvious when the condition of the evidence is considered. The evidence is clear that there had been no meeting between appellant and Griesedieck. If there was a conspiracy involving appellant, Prather had been the go-between. The only direct evidence connecting appellant was given by Prather. Prather had early pleaded guilty and had testified at the three trials of this case but had never been sentenced. It is entirely plausible, if not obvious, that his testimony was given with the various possibilities of an unannounced sentence hanging over him and with the possibility of such situation affecting his testimony as to appellant. On the other hand, the main evidence for appellant was by himself, his brother, and his uncle, who had been also his employee—such relationships and interests might well affect the view of a jury as to credibility of such witnesses on both sides. Outside evidence would have a particular importance. There was no dispute that this raid by Gus Nations had taken place. The above testimony for appellant was a plausible explanation of the inciting cause thereof. If that evidence stood unattacked and unweakened, it would powerfully support the theory of appellant and the credibility of his evidence.

Counsel for the government had no difficulty in realizing this situation. They sought to meet it by the introduction of the evidence now in contention. The sole purpose and the sole possible effect of that evidence is to furnish a cause for the conceded raid by Gus Nations other than that proffered by the above testimony for appellant. In its brief, the government argues this matter as follows: "It appears, then in the last analysis, according to Gus Nations' own statement, that he had been advised that the Griesedieck Brewery was running under protection, and that for almost a year his brother had been on the job 'watching' with him this Griesedieck Brewery, but that not until the General Agents from Kansas City in charge of and in command of the Intelligence Unit, were assembled in St. Louis to make this raid, did Gus Nations come back to St. Louis, leaving work unfinished in Kansas City, and reaching his office as early as 8 o'clock in the morning, proceed to the Griesedieck plant, and as expressed in the vernacular—'beat them to the punch.'"

This contested evidence is to the effect that general prohibition agents had for some time been suspicious that this brewery was being protected and was sending out beer, and they were in St. Louis investigating that matter and the operations of the brewery. That they had determined to raid the brewery on this same day. That when they went to raid it that morning they found Gus Nations had already raided it earlier in the morning.

Obviously, the activities of these general agents have nothing whatever to do with the issues here unless some knowledge thereof can be brought home to appellant or to Gus Nations. If appellant knew of the contemplated raid by them, it might be plausibly argued that the motive of protecting himself or his brother might have induced a communication to his brother which would have anticipated that raid. If Gus Nations alone had known of the contemplated raid by the general agents, he might have sought to anticipate it for his own protection, since this brewery was in the territory under his supervision. Either situation would afford a plausible explanation for his raid, entirely different from the one put forward by the testimony for appellant and thus would weak-

en, if not destroy the effect of that very important testimony. Such is the only place of this evidence in this case.

This evidence clearly and without dispute shows an investigation by these general agents and the attempted raid later on the same day of the raid by Gus Nations. It was strenuously objected to because, it was claimed, it had nothing to do with the issues here. Certainly it had nothing to do therewith unless it was in some way connected with a knowledge thereof on the part of appellant or of Gus Nations before he made his raid. There is not one syllable of connecting evidence. There are no circumstances from which such knowledge could be legitimately inferred. Such evidence as is present tends to prevent any such inference. The evidence shows this raid and investigation by general agents entirely disconnected with Gus Nations and his force and by agents brought in from other places. There were a number of men in this investigation and five engaged in the raid, of which only two were placed upon the stand. Such evidence is in the testimony of witness Sklarey, who was one of the two witnesses as to these activities of the general agents. He testified as follows: "I knew Gus Nations from seeing him around the building between January 12th and February 21st. We had no meeting together. I had no communication with him, at all, about my being here, or anything of that kind. Inasmuch as I was investigating Prather and Heber Nations, I did not let them know I was here investigating. When I went down there, I had never, as far as I know, given out any information that they would know that I was coming down there."

Gus Nations testified: "As the matter of my information which caused me to make this raid: I did not get that information from anybody except my brother."

The very purpose and character of this investigation would necessitate secrecy—particularly as to appellant and Gus Nations. Another circumstance bearing on this matter of information is that Prather testified he met Griesedieck in St. Louis on February 20th, the day Gus Nations was in Kansas City, and "told him that he could run the next day, the 21st." If the conspiracy existed involving appellant, and Prather was relaying information from appellant to Griesedieck as to when the beer could be put out, it is clear appellant could have had no information of the impending raid upon that date or he would not have let Prather tell the brewery it could run that day. In fact, Prather testifies

that in the July or August preceding (six months before), appellant told him to tell Griesedieck that "there was some danger of getting in trouble about it on account of some outside forces being in town which were not under his control." We repeat there is no particle of evidence connecting appellant or Gus Nations with any knowledge of this impending raid or the investigation at that time by the general agents.

The answer, in appellee's brief, to this contention is: "To sustain his contention he offers a letter from his uncle, Marion H. McFarland, and a series of letters which passed between Gus and himself; the contention of the government is that these letters are fabrications; that the testimony in reference thereto is false and untrue; that they were made for the purpose of this defense; and we respectfully submit that a careful reading of the same will show that they were prepared with great care for a particular purpose. * * * This point came before this court in virtually the same form as now presented in Nations v. United States, 32 F. (2d) 598, and was passed upon and decided against the contention of the defendant."

If this court disposed of this matter on a former appeal, we will regard that as determining the matter now. That this character of evidence was received at the second trial, was urged as error on that appeal, and was, by this court, held admissible therein, is certain. Appellant contends there was additional evidence at the former trial which makes the situations then and now materially different. The claimed difference is that at the former trial, one W. F. Duckett testified to receiving at Kansas City, on February 20th, in the presence of Gus Nations, a telephone call concerning the raid contemplated for the next day by the general agents and that he used language in that telephone conversation which would have apprised Gus of the contemplated raid.

It is enlightening to trace this evidence through this litigation as shown by the records in this court. At the first trial it was first offered in the testimony of witness Sklarey (Record in case No. 7173, p. 127), when, upon objection, it was admitted subject to being "connected up in the case," and upon counsel's assurance thereof the trial court said: "If it is not connected up I will take it out for you later on." It came in also in the testimony of E. B. Henson, another participant in the raid by the general agents (same Record, p. 130). Toward the end of the government's case at that trial (witness

Harry Dingler, pp. 170, 171) when the same character of evidence was offered, an objection that no connection had been made and such evidence "would be wholly immaterial, in the absence of knowledge, or opportunity for knowledge to be brought home to the defendant," the court said: "Yes, I think so. It may become relevant later. If it does you may offer it again. I will sustain the objection now." On the appeal from that trial this court discussed and determined only one matter—the disqualification of the trial judge. At the second trial counsel for the government, in his opening statement, said:

"Now, Gentlemen of the Jury * * * The thing rocked along further, and on or about the 21st of February, 1924, Griesedieck and Prather and Nations had agreed upon a date at which they could run. They started the plant. Gus O. Nations had left and gone to Kansas City upon business. Agents for the Government—

"Mr. Cullen: If the Court please, we object to any statement about agents for the Government, because not connected in any way, prejudicial to the rights of the defendant, res inter alias acta, as far as anything in this case is concerned, and we object to any further reference to it at this time.

"The Court: Overrule the objection.

"To which ruling of the Court, the defendant, by his counsel, then and there at the time duly excepted.

"Mr. Dyott: Agents for the Government checking up upon the operations of this concern on or about the 21st day of February, 1924, were in St. Louis for the purpose of closing up and raiding the plant. Gus Nations was at Kansas City, as the evidence will show, and Gus Nations quit the work that he was there upon and immediately came over to St. Louis, went down to the Griesedieck Brothers Brewery Company that morning, and before the other agents closed in on the place, closed in upon the place and raided it. * * *"

The same evidence (as on the first trial) was first offered from witness Sklarey (Record in case No. 8295, p. 197), where it was admitted over objection of immateriality and as not connected by any knowledge thereof on the part of defendant, Prather, or Gus Nations. The same character of evidence again appeared from witness Dingler, was met with the same objection, and admitted (same Record, pp. 214, 215). On direct examination of Gus Nations (witness for defense) he was asked if he had any information that general agents were about to raid

the brewery and answered he had never heard of such a thing (same, p. 268–9). Witness Hogg (for defense) was asked concerning the general agent raid on direct examination (same, pp. 327, 328). Same as to defense witness Hazenstab (same, p. 338). Dillon (defense witness and a member of the raiding party of the general agents) was interrogated on direct examination about the same matter (same, pp. 347–349). In the cross-examination of Gus Nations he was asked if he had seen a Mr. Duckett in the office at Kansas City on February 20th and whether he heard him in a telephone conversation say: "Going to St. Louis tonight? What? What is going on in St. Louis? Griesedieck Brewery?" To which the witness answered: "If Mr. Duckett was there, I did not know it. If he talked over the telephone, I did not know it; * * * never heard it suggested until this good hour" (same, p. 301), and he was positive that did not happen in his presence and hearing (same, p. 302). Upon rebuttal, Wm. Duckett was placed upon the stand. He testified that he was a prohibition agent under Mr. Moss; that he was in the office at Kansas City on February 20th; that about 3 o'clock in the afternoon he received a call there from Mr. Henson, another agent, summoning him to St. Louis; that he repeated, "St. Louis tonight? What brewery? The Griesedieck Brewery"; that Gus Nations was about ten feet away; that he thought he talked loud enough so the people about the office could hear him; that he did not tell Nations or any one else of the conversation; that he went to St. Louis that night and participated in the attempted raid of the brewery by the general agents; that he was at the first trial but not called as a witness. The motion and supplemental motion for new trial filed in that trial contain a ground that Duckett committed perjury in that no such telephone conversation took place. This is rather strongly supported by affidavits and offers to prove, in connection with the hearing of the motions, the matters alleged in the affidavits. Upon the appeal of that trial, counsel for either side contended as to the admissibility of this evidence. As to this phase, the main contention of appellant was that no knowledge of the contemplated raid was brought home to *him* and that any independent knowledge of Gus Nations was immaterial, and that the evidence was highly prejudicial. Appellee argued that the evidence was admissible as showing the illegal operation of the brewery "and if these officers were prevented from accomplishing their purpose the reason is likewise pertinent." Appellee argued also that even

if the evidence were inadmissible, it was harmless error waived by appellant because he had brought out the same evidence from three of his own witnesses (Dillon, Hogg and Hazenstab).

The judgment on this second trial was reversed because of prejudicial argument by counsel for the government. 32 F.(2d) 598. In the course of the opinion, this court disposed of the contention of appellant as to admission of the evidence of the raid by the general agents. This it did by stating the contention of the government as to this testimony followed by the single sentence: "There is some evidence of circumstances in the case justifying the admission of the testimony complained of, and we think that there was no error in overruling the defendant's objection to this testimony." It is unfortunate that we did not then state what those "circumstances" were and what that "evidence" was because, had the trial court been more fully apprised, it would have had better guidance upon the succeeding trial. Also, we would not now find it necessary to ascertain, by an examination of the record in that appeal, what the court then had in mind. We have carefully examined that record to ascertain what these circumstances and evidence were. We find ample justification for that ruling in the fact that there was evidence of circumstances which would, if believed by the jury, have brought home to Gus Nations, at Kansas City, on February 20th, knowledge of the contemplated raid by the general agents the next day. While there was no evidence that appellant had such knowledge, that was not necessary to the admissibility of that testimony. Without such knowledge by appellant, it was admissible because it served to weaken the very important testimony of the appellant to the effect that the raid by Gus Nations was caused solely by information given by him to Gus. Gus was interested in catching and raiding this brewery, even under his own evidence. According to that evidence, he had been particularly anxious to catch it in violations of the law and had, for months, devoted special attention thereto without success. Also, it would not be to his credit that general agents should discover major violations in territory under his supervision. All of this would be true even if his brother (appellant) were not in a conspiracy or if he (Gus) were ignorant of such conspiracy. Also, it would be to his interest to anticipate this raid if he had knowledge of such conspiracy. Under any circumstances, it would not have been unnatural for him to anticipate this raid if he had knowledge or serious suspicion such a raid was contemplated. The evidence of Duckett supplied the circumstances whereby he might have secured such information. We have been able to find in that record no other "evidence of circumstances" justifying the admission of this evidence. We have no doubt that there was no error in the admission of this evidence under the connecting evidence of Duckett at the second trial. However, that essential connecting evidence is entirely absent now. Duckett was not a witness, nor was there any other evidence connecting this evidence either with appellant or with Gus Nations. The situation concerning which this court spoke on the last appeal and the situation now are essentially and vitally different. Therefore, the ruling on this appeal is not governed by that on the second appeal.

Since this matter is not foreclosed, we have no hesitation in holding that the admission of this evidence was error and prejudicial error. The only possible bearing of this raid by the general agents upon any issue or evidence in this case is to weaken or destroy a very important piece of evidence introduced by appellant—that the raid of Gus Nations was occasioned by information given by him to Gus—by showing that the inciting cause for the raid made by Gus was not such information but was knowledge or serious suspicion of the impending raid by the general agents. It cannot have such bearing without some evidence justifying an inference that Gus had such knowledge or suspicion before he made his raid and there is no such evidence here. Such inference is not justified by the mere coincidence of the raid. That would require an inference of such knowledge or suspicion as a basis for the further inference that he acted thereon.

 Such double inferences are too remote to constitute evidence. As said by the Supreme Court in U. S. v. Ross, 92 U. S. 281, 283, 23 L. Ed. 707: "They are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible. No inference of fact or of law is reliable drawn from premises which are uncertain." Also see C., M. & St. P. Ry. v. Coogan, 271 U. S. 472, 477, 46 S. Ct. 564, 70 L. Ed. 1041; Looney v. Met. R. R. Co., 200 U. S. 480, 488, 26 S. Ct. 303, 50 L. Ed. 564; Xenia Bank v. Stewart et al., 114 U. S. 224, 231, 5 S. Ct. 845, 29 L. Ed. 101; Manning v. Ins. Co., 100 U. S. 693, 697–698, 25 L. Ed. 761; also cases

in this court as follows: U. S. v. Le Duc, 48 F.(2d) 789, 793; General Reinsurance Corporation v. Southern Surety Co., 27 F.(2d) 265, 272; Wagner v. U. S., 8 F.(2d) 581, 586; A., T. & S. F. Ry. Co. v. De Sedillo, 219 F. 686, 689; M., K. & T. Ry. Co. v. Foreman, 174 F. 377, 383; Vernon v. U. S., 146 F. 121, 125, 126; U. S. Fidel. & G. Co. v. Des Moines Nat. Bank, 145 F. 273, 279; also, in other circuits, the following: The Oakland, 241 F. 66, 67–68 (C. C. A. 4); Smith v. Penn. Ry. Co., 239 F. 103, 104 (C. C. A. 2); Cunard S. S. Co. v. Kelley, 126 F. 610, 615–616 (C. C. A. 1). Cases to the same effect which involved presumptions or inferences of knowledge are U. S. v. Carr, 132 U. S. 644, 653, 654, 10 S. Ct. 182, 33 L. Ed. 483; two cases in this court, Niederluecke v. U. S. (C. C. A.) 47 F.(2d) 888, and Niederluecke v. U. S. (C. C. A.) 21 F.(2d) 511; also, J. W. Ringrose Co. v. W. & J. Sloane, 266 F. 402, 404, Eastern D. C. of Pennsylvania. The two Niederluecke Cases in this court, when considered together, well reveal the rule. In each of these cases Niederluecke was accused of transportation of a stolen car. In each he admitted the transportation but denied knowledge that the car was stolen. In the earlier case there was no evidence from which such knowledge could be inferred. In the later case there was such evidence.

Because this evidence is too remote it was inadmissible. There can be no doubt that it was prejudicial. It permitted the jury to "suspicion" that there was some connection between the raid by Nations and the raid by the general agents. That was the clear design of this evidence. Without a word of connecting proof, the jury were permitted to suspicion a reason for the raid by Nations other than that given by the witnesses for appellant. The importance of this evidence for appellant in its bearing upon the issues has been stated above and is clear.

By this error, the appellant was prevented from having a fair trial, and because thereof the judgment must be and is reversed and remanded for a new trial.